## Stuart I. Fox, et al.,[1] Petitioners *v.* Commissioner of Internal Revenue, Respondent

Docket Nos. 3593–81, 3600–81,    Filed May 18, 1983.
5029–81, 5632–81,
6169–81, 6342–81,
6996–81, 9256–81,
9460–81, 9462–81,
12191–81, 12192–81,
12194–81, 15663–81,
15664–81, 20703–81.

*John D. Houston II, Thomas E. Lippard,* and *Michael J. Dempster,* for the petitioners.
*Francis J. Emmons,* for the respondent.

Nims, *Judge:* In these consolidated cases, respondent determined the following deficiencies in petitioners' Federal income taxes and additions to tax:

---

[1]Cases of the following petitioners are consolidated herewith: Gerald J. Roncolato and Pauline H. Roncolato, docket No. 3600–81; Michael J. Aranson and Patti J. Aranson, docket No. 5029–81; Robert S. Markovitz and Adele B. Markovitz, docket No. 5632–81; William P. Kratsa, docket No. 6169–81; Richard J. and Marsha Leffel, docket No. 6342–81; Gerald E. Feldman and Anita T. Feldman, docket No. 6996–81; Mervin S. Stewart and Marcia Stewart, docket No. 9256–81; Howard J. Hook and Sarah E. Hook, docket No. 9460–81; Reuben Zemel and Aida Zemel, docket No. 9462–81; John W. Barnard and June W. Barnard, docket No. 12191–81; Earl D. Kay, Jr., and Nancy O. Kay, docket No. 12192–81; Joseph J. Allen and Jennene S. Allen, docket No. 12194–81; Ronald I. Dozoretz and Marilyn B. Dozoretz, docket No. 15663–81; Walter A. Gunkler, docket No. 15664–81; and Stanley Rosenblatt, docket No. 20703–81.

| Docket No. | Petitioners | Year | Deficiency | Addition to tax sec. 6653(a)[2] |
|---|---|---|---|---|
| 3593–81 | Stuart I. Fox | 1976 | $1,900.00 | |
| | | 1977 | 1,212.63 | |
| 3600–81 | Gerald J. Roncolato and Pauline H. Roncolato | 1976 | 3,655.00 | |
| | | 1977 | 2,099.00 | |
| 5029–81 | Michael J. Aranson and Patti J. Aranson | 1975 | 1,750.000 | $87.50 |
| | | 1976 | 21,482.00 | 1,074.10 |
| | | 1977 | 40,433.00 | 2,022.15 |
| 5632–81 | Robert S. Markovitz and Adele B. Markovitz | 1975 | 6,987.00 | |
| | | 1976 | 4,202.00 | |
| | | 1977 | 3,188.00 | |
| 6169–81 | William P. Kratsa | 1976 | 20,667.00 | |
| | | 1977 | 12,235.00 | |
| 6342–81 | Richard J. Leffel and Marsha Leffel | 1976 | 10,815.00 | |
| | | 1977 | 7,523.00 | |
| 6996–81 | Gerald E. Feldman and Anita T. Feldman | 1975 | 5,497.26 | |
| | | 1976 | 12,422.50 | |
| | | 1977 | 33,462.62 | |
| 9256–81 | Mervin S. Stewart and Marcia Stewart | 1976 | 8,431.00 | |
| | | 1977 | 3,903.00 | |
| 9460–81 | Howard J. Hook and Sarah E. Hook | 1976 | 9,552.00 | |
| | | 1977 | 4,585.00 | |
| 9462–81 | Reuben Zemel and Aida Zemel | 1976 | 151.000 | |
| | | 1977 | 6,300.00 | |
| 12191–81 | John W. Barnard and June W. Barnard | 1976 | 9,157.00 | |
| | | 1977 | 2,729.00 | |
| 12192–81 | Earl D. Kay, Jr., and Nancy O. Kay | 1976 | 9,400.00 | |
| | | 1977 | 4,585.00 | |
| 12194–81 | Joseph J. Allen and Jennene S. Allen | 1976 | 9,087.00 | |
| | | 1977 | 4,790.00 | |
| 15663–81 | Ronald I. Dozoretz and Marilyn B. Dozoretz | 1976 | 52,341.00 | |

---

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as in effect during the years in issue. Unless otherwise indicated, all references to Rules are to the Tax Court Rules of Practice and Procedure.

|  |  |  |  | Addition to tax |
|---|---|---|---|---|
| Docket No. | Petitioners | Year | Deficiency | sec. 6653(a)[2] |
| 15664–81 | Walter A. Gunkler | 1976 | $60,078.00 | |
| | | 1977 | 44.00 | |
| 20703–81 | Stanley Rosenblatt | 1976 | 8,259.09 | |
| | | 1977 | 6,517.22 | |

These cases were consolidated only for the purpose of deciding the extent to which the petitioners may deduct their distributive share of partnership losses of two partnerships, J. W. Associates and Scorpio '76 Associates, in 1976 and 1977. Resolution of these issues will allow for the entry of decision in the following docket numbers: 3593–81, 3600–81,[3] 6169–81, 6342–81, 9460–81, 9462–81, 12191–81, 12192–81, 12194–81, and 20703–81. After our opinion herein, the following cases will be restored to the general docket for resolution of other issues not involving J. W. Associates or Scorpio '76 Associates: 5029–81, 5632–81, 6996–81, 9256–81, 15663–81, and 15664–81.

The specific issues for decision involving J. W. Associates and Scorpio '76 Associates are:

(1) Whether the purported acquisition of book publishing rights by these partnerships was a sham, serving no business purpose and lacking any economic substance, such that the claimed partnership losses should be disallowed entirely;

(2) Whether the publishing activities of these partnerships constituted activities not engaged in for profit within the meaning of section 183;

(3) Whether the partners and partnerships may include in their bases (for purposes of sections 704(d) and 167) the nonrecourse notes given by the partnerships to Laurel Tape & Film, Inc., in connection with the alleged purchase of book publishing rights;

(4) Whether the partnerships may properly deduct under section 163 interest accrued on the above-mentioned nonrecourse notes;

(5) Whether the partnerships have employed proper methods of depreciating their book publishing rights and whether

---

[3] In addition to disallowing the claimed partnership loss deduction for J. W. Associates in this docket, respondent also disallowed $364 of medical deductions in 1976. The adjustment to the medical deduction flowed automatically from the increase in gross income created by the disallowance of the J. W. Associates loss. Accordingly, resolution of the J. W. Associates issue will also resolve the medical deduction issue in this docket.

they have established the proper depreciable bases of those rights;

(6) Whether the partnerships have established the deductibility of various miscellaneous items under either section 162 or section 212;

(7) Whether the petitioners have established that they were partners in the partnerships during 1976 and 1977 and, if so, that their claimed losses reflect the varying interests of the partners in items of income and deduction within the meaning of section 706(c)(2)(B), and

(8) Whether evidence concerning other partnerships promoted by Resource Investments, Inc., may be considered in determining the issues involving J. W. Associates and Scorpio '76 Associates.

## FINDINGS OF FACT

Some of the facts have been stipulated. The stipulations and the exhibits attached thereto are incorporated herein by reference.

Petitioner Stuart I. Fox resided at Williamsville, N.Y., at the time he filed the petition in docket No. 3593–81. On his 1976 and 1977 income tax returns, he deducted losses of $6,059 and $3,057, respectively, in connection with J. W. Associates.

Petitioners Gerald J. Roncolato and Pauline H. Roncolato, husband and wife, resided at Elma, N.Y., at the time they filed the petition in docket No. 3600–81. On their 1976 and 1977 income tax returns, they deducted losses of $12,118 and $6,113, respectively, in connection with J. W. Associates.

Petitioners Michael J. Aranson (hereinafter Aranson) and Patti J. Aranson, husband and wife, resided at Pittsburgh, Pa., at the time they filed the petition in docket No. 5029–81. On their 1976 and 1977 income tax returns, they deducted losses of $202 and $10,087, respectively, in connection with J. W. Associates and $4,075 and $18,673, respectively, in connection with Scorpio '76 Associates.

Petitioners Robert S. Markovitz (hereinafter Markovitz) and Adele B. Markovitz, husband and wife, resided at Pittsburgh, Pa., at the time they filed the petition in docket No. 5632–81. On their 1976 and 1977 income tax returns, they deducted losses of $4,116 and $2,829, respectively, in connection with Scorpio '76 Associates.

Petitioner William P. Kratsa resided at Pittsburgh, Pa.; at the time he filed the petition in docket No. 6169–81. On his 1976 and 1977 income tax returns, he deducted losses of $32,599 and $22,407, respectively, in connection with Scorpio '76 Associates.

Petitioners Richard J. Leffel and Marsha Leffel, husband and wife, resided at Pittsburgh, Pa., at the time they filed the petition in docket No. 6342–81. On their 1976 and 1977 income tax returns, they deducted losses of $24,449 and $16,805, respectively, in connection with Scorpio '76 Associates.

Petitioners Gerald E. Feldman (hereinafter Feldman) and Anita T. Feldman, husband and wife, resided at Bradford Woods, Pa., at the time they filed the petition in docket No. 6996–81. On their 1976 and 1977 income tax returns, they deducted losses of $202 and $10,087, respectively, in connection with J. W. Associates and $4,075 and $18,673, respectively, in connection with Scorpio '76 Associates.

Petitioners Mervin S. Stewart and Marcia Stewart, husband and wife, resided at Pittsburgh, Pa., at the time they filed the petition in docket No. 9256–81. On their 1976 and 1977 income tax returns, they deducted losses of $12,118 and $6,113, respectively, in connection with J. W. Associates.

Petitioners Howard J. Hook and Sarah E. Hook, husband and wife, resided at Pittsburgh, Pa., at the time they filed the petition in docket No. 9460–81. On their 1976 and 1977 income tax returns, they deducted losses of $18,177 and $9,170, respectively, in connection with J. W. Associates.

Petitioners Reuben Zemel and Aida Zemel, husband and wife, resided at Pittsburgh, Pa., at the time they filed the petition in docket No. 9462–81. On their 1976 and 1977 income tax returns, they deducted losses of $303 and $15,130, respectively, in connection with J. W. Associates.

Petitioners John W. Barnard and June W. Barnard, husband and wife, resided at Portsmouth, Va., at the time they filed the petition in docket No. 12191–81. On their 1976 and 1977 income tax returns, they deducted losses of $18,177 and $9,170, respectively, in connection with J. W. Associates.

Petitioners Earl D. Kay, Jr., and Nancy O. Kay, husband and wife, resided at Chesapeake, Va., at the time they filed the petition in docket No. 12192–81. On their 1976 and 1977

income tax returns, they deducted losses of $18,177 and $9,170, respectively, in connection with J. W. Associates.

Petitioners Joseph J. Allen and Jennene S. Allen, husband and wife, resided at Portsmouth, Va., at the time they filed the petition in docket No. 12194–81. On their 1976 and 1977 income tax returns, they deducted losses of $18,177 and $9,170, respectively, in connection with J. W. Associates.

Petitioners Ronald I. Dozoretz and Marilyn B. Dozoretz, husband and wife, resided at Portsmouth, Va., at the time they filed the petition in docket No. 15663–81. On their 1976 income tax return, they deducted a loss of $60,590 in connection with J. W. Associates.

Petitioner Walter A. Gunkler resided at Ilion, N.Y., at the time he filed the petition in docket No. 15664–81. In his 1976 and 1977 income tax returns, he deducted losses of $89,977 and $458, respectively, in connection with J. W. Associates.

Petitioner Stanley Rosenblatt resided at Johnstown, Pa., at the time he filed the petition in docket No. 20703–81. In his 1976 and 1977 income tax returns, he deducted losses of $16,299 and $11,204, respectively, in connection with Scorpio '76 Associates.

## J. W. Associates

Resource Investments, Inc. (hereinafter Resource), is a Pennsylvania corporation with it principal place of business in Pittsburgh, Pa. Resource was organized in March 1975, by Edward D. Ging and petitioners Aranson and Feldman. These three men were directors, officers, and one-third shareholders in Resource during the years before the Court. Resource is licensed as an investment adviser with the Securities and Exchange Commission and confines its activities to specialized types of investment vehicles, primarily in the field of real estate. Typically, Resource participates in the organization of limited partnerships and the solicitation of affluent investors for these partnerships. The partnerships, in turn, make leveraged investments in Resource-recommended properties, using extensive nonrecourse financing.

Prior to its involvement with J. W. Associates, Resource had helped organize movie and TV-documentary investment partnerships. In the case of at least some of these partnerships, Resource had arranged for the partnerships to acquire film

and video-tape products from Laurel Tape & Film, Inc. (hereinafter Laurel). Laurel is a Pennsylvania corporation with its principal place of business in Pittsburgh, Pa. In 1973, Laurel was the wholly owned subsidiary of a company controlled by George A. Romero (hereinafter Romero), a film director. At that time, Richard P. Rubinstein (hereinafter Rubinstein) acquired one-third of the stock of Laurel, which he held until the end of 1976. During the period in which Romero and Rubinstein operated Laurel, Laurel engaged primarily in the production of documentary film biographies. Romero basically provided the artistic and creative element of the business (as film director) while Rubinstein mostly handled business details (as producer).

Early in 1976, Rubinstein discussed with Aranson the possibility of Resource's sponsoring investments in the publishing industry. Up to this time, Resource had never been involved with book publishing and Aranson knew almost nothing of the subject. Rubinstein knew some agents in the publishing business, but his knowledge of that field was also limited; Laurel, for example, had never previously published a book. Shortly after this discussion, Rubinstein approached a literary agent, Jay Acton (hereinafter Acton), who was up to that point Rubinstein's primary source of publishing expertise. Rubinstein indicated to Acton that if Acton could find the proper literary vehicle, financing through a Resource-sponsored partnership might be arranged.

Acton was at that time an agent for John Wilcock (hereinafter Wilcock). Wilcock had previously authored or coauthored several books in the travel field, including nine travel guides in the Arthur Frommer series of books "[Country] on $5 a Day" and several TWA Getaway Guides. Over the 10 years prior to 1976, the Arthur Frommer books Wilcock authored or coauthored sold, in the aggregate, several hundred thousand copies. In addition, Wilcock had published "The Autobiography and Sex Life of Andy Warhol" and at least two editions of "The Witches Almanac."

Acton proposed that Wilcock write a book for Laurel of approximately 50,000 words whose subject matter would be a combination of practical travel information and historical background on mysterious and mystical sites in South America. The book, titled "An Occult Guide to South America,"

would be an attempt to capitalize on Wilcock's success as a travel guide author and the current fad for books on the occult—most notably books like "Chariots of the Gods," by Erich Von Daniken, which sold over 1 million copies. This proposal proved acceptable to Aranson and a series of simultaneous negotiations commenced.

J. W. Associates was a partnership set up by Resource to be the ultimate repository of the publishing rights to "An Occult Guide to South America." A bank account in the partnership's name was opened with Pittsburgh National Bank on April 22, 1976. A certificate of limited partnership on behalf of J. W. Associates was filed with the Department of State of Pennsylvania on June 28, 1976, naming Romero as general partner with a 2-percent interest in the partnership's net cash flow, net profits, net losses and tax credits and Aranson as the sole limited partner with a 98-percent interest in the above items. Romero was made the general partner because Resource was concerned that it did not know anything about book publishing and felt that someone from Laurel (whose idea the book venture initially was) should be responsible for any unforseen partnership debts. Although nominally the general partner, Romero did little more than acquiesce in all decisions made for the partnership by Resource and sign all necessary papers sent to him by Resource. Resource, itself, provided all management, bookkeeping, banking, correspondence, and tax return preparing services for J. W. Associates during the years in issue. It was the promoters' intention that subscribers to this limited partnership offering would eventually be substituted as limited partners in J. W. Associates through the acquisition of all of Aranson's 98-percent limited partnership interest.

Although Wilcock had neither begun researching nor writing the book at the time, in April 1976, the framework for the book venture and the relevant prices were established among the various principals. The idea was to have Laurel hire Wilcock to write the book on a service basis; i.e., all right, title, and interest in the copyright would be held by Laurel. Laurel would agree to pay Wilcock $25,000 as an advance against 20 percent of Laurel's receipts of income from distribution of the book. In addition, Laurel would reimburse Wilcock for up to $10,000 in expenses connected with producing the book. This contract would be immediately sold by Laurel to J. W.

Associates, which would pay Laurel $120,000 in cash plus a nonrecourse note. Laurel would distribute the $120,000 cash as follows:

| | | |
|---|---|---|
| $25,000 | – | to Wilcock pursuant to the Laurel-Wilcock contract |
| 10,000 | – | to Laurel's attorneys who drafted the various contracts, for legal fees |
| 15,000 | – | to be kept by Laurel |
| 5,000 | – | to Acton for his services |
| 5,000 | – | to an unspecified person for promotion |
| 60,000 | – | for third-party costs for preparation, printing, editing, design, photos, binding, shipping, insurance, and Wilcock's travel expenses |
| 120,000 | | |

An April 15, 1976, letter from Rubinstein to Resource detailing this structure contemplated the initial printing of 10,000 soft cover and 5,000 hard cover copies of the book. The Ultimate Mirror, Ltd., a corporate entity in which Rubinstein held the majority interest, would agree to act as sales agent for the partnership for a 10-percent fee. The letter further stated: "A note in an amount to be determined by you [i.e., Resource] will be payable [to Laurel] on a 50/50 basis on all income from the United States and Canada and an 80/20 split in favor of Laurel for foreign income." A follow-up note from Rubinstein to Resource on April 19, 1976, reads:

On rereading my letter to you of April 15th, I find that my secretary misread one sentence. With respect to the note, it should read that the amount of the note will be determined by negotiation between you and Laurel.

Since neither Resource nor Laurel had prior experience with publishing and distributing a book, Acton went about locating a distributor for the book and commissioning third parties to collect the photos, design the covers, and print and bind the book. The distributor Acton chose was Stein & Day, Inc.

Stein & Day, Inc., is a Delaware corporation with its principal place of business at Briarcliff Manor, N.Y. During the mid-1970's, Stein & Day, Inc., distributed and/or published approximately 100 new titles (covering a broad range of subjects) each year. Books distributed by Stein & Day, Inc., would be listed in its twice-yearly catalog. The May Stein &

Day catalog would advertise books whose publication would begin from the end of August to mid-February of the following year. The December catalog would advertise books whose publication would begin between late-February and mid-August of the following year.

A book's appearance in the Stein & Day, Inc., catalog did not mean that the book was already published, or even written, at the time the catalog came out. Usually only a manuscript, in the process of being edited, existed at such time. Typically, prior to the actual publication date of a Stein & Day, Inc., book, the following would occur: (1) A 2- to 5-minute presentation about the book would be made by the book's editor to the Stein & Day, Inc., sales staff at a sales staff meeting coinciding with the appearance of the May or December catalog; (2) copies of the book (often in galley proofs) would be sent to book reviewers whose reviews were commonly read by book store owners, book store chains, book wholesalers and librarians; (3) the book would be exhibited (sometimes only with a printed cover surrounding a blank or unfinished book) at the yearly American Booksellers Association convention; (4) advertising in publishing trade periodicals announcing the book would be placed; and (5) prepublication sales would be solicited. After copies of books were shipped to retail distributors, Stein & Day, Inc., marketing efforts would focus on the consumers—attempting to interest them in the book so that book stores would be able to sell out the books already purchased from Stein & Day, Inc. (It is common practice in the publishing industry that book stores which have been unable to sell the books they purchased from the distributor may return such books to the distributor, if undamaged, for a full refund.)

Sol Stein (hereinafter Stein) of Stein & Day, Inc., negotiated an agreement with Rubinstein, who was acting on behalf of the Ultimate Mirror, Ltd., "as agent for Resource Investments, Inc. or for a limited partnership Resource Investments Inc. represents" with regard to the distribution of "An Occult Guide to South America." The agreement, entered into sometime between April 29, 1976, and May 7, 1976, gives Stein & Day, Inc., the right to distribute 10,000 soft cover and 5,000 hard cover copies of the book as soon as practical after receiving the finished copies of the book at its warehouse. Stein & Day, Inc., would receive a distribution fee equal to 35

percent of gross billings and would be allowed to further withhold 25 percent of billings as a reserve against returns. The contract further provides:

4. The Distributor, at its sole discretion, shall handle all publicity and promotion, and the Publisher agrees to reimburse the Distributor for the cost of special mailings, promotional materials (releases, flyers, galleys, review copies, etc.) for the time the Distributor's staff spends on publicity and promotion of the Work, and for the corresponding pro-rated overhead. Such expenses shall not exceed $5,000.

An undated rider, signed only by Romero on behalf of J. W. Associates, indicates the partnership's acceptance of the terms of this agreement.

The 35-percent distribution fee charged by Stein & Day, Inc., was rather high by that company's standards for distributing other publisher's works. The 35-percent figure was arrived at by considering the number of copies to be distributed, the "viability" of the book and other factors. Stein viewed his company's job as essentially distributing only the 15,000 copies of "An Occult Guide to South America." He considered the potential revenue a small pie out of which he would need to take a large piece to cover his expenses. Stein also had "severe reservations" about the book, feeling it had limited market potential because although there was a fad at the time on books about the occult, this book was limited to a specific area of the world.

A letter dated April 22, 1976, and signed by Wilcock and Rubinstein (on behalf of Laurel), recites that Wilcock agrees to write "An Occult Guide to South America" for Laurel on the terms described previously. The unedited manuscript and other materials (photos, maps, etc.) were to be delivered to Laurel by June 1, 1976. The letter also states that it would be replaced by a more formal document as soon as possible and that all terms and conditions of the agreement are "subject to the terms and conditions of the purchase and escrow agreements to be drawn between R.I.I. [Resource] or the limited partnership it represents." An undated contract between Laurel and Wilcock formalized the terms of the April 22, 1976, letter. This undated formal contract (1) provides that the book is to be based on "those sites in South America noted in the outline attached hereto and marked as Exhibit 'A'," (no "Exhibit 'A'" is attached), (2) mentions J. W. Associates as the

future ultimate purchaser of the manuscript "pursuant to a Purchase Agreement and Promissory Note executed the ___ day of _____, 1976, a copy of which is attached hereto and marked as Exhibit 'B','" (the dates are not filled in and no such exhibit is attached), and (3) states that on or before February 1, 1977, Wilcock will be paid his $25,000 advance against 20 percent of Laurel's gross proceeds from distribution of the manuscript or sale of subsidiary rights thereto, "but no payment shall be made prior to release of Escrow Funds pursuant to the Escrow Agreement, Exhibit ____a copy of which is attached hereto," (no such escrow agreement is attached). This undated formal agreement is signed by Wilcock and Rubinstein.

An undated formal agreement between Laurel and J. W. Associates provides for the purchase of all Laurel's right, title, and interest to "An Occult Guide to South America." As consideration for the purchase of the manuscript, the partnership agreed to pay Laurel $660,000, $163,000 in cash and $495,000 in a nonrecourse note.[4] The major portion of the cash was to be paid to Laurel or put in escrow for Laurel on the occurrence of certain events prior to the closing. Thirty thousand dollars was to be placed in escrow on June 1, 1976, on receipt of certification from Laurel that Wilcock had by then compiled the raw data for the book, and $40,000 was to be placed in escrow on July 1, 1976, on certification that an edited manuscript had been delivered to the printer. The closing was tentatively scheduled to occur on August 1, 1976, at which time the nonrecourse note would be delivered.

With regard to the nonrecourse note, the contract stated:

Said note will be substantially in the form of Schedule "B" attached hereto; said note will be secured by a purchase money security interest in the manuscript which will be set forth in a security agreement of even date from Buyer to Seller substantially in the form of Schedule "C" attached hereto; and said note will be payable on August 1, 1986 with interest as hereinafter provided.

       *       *       *       *       *       *       *

12. A. Until the non-negotiable promissory note is paid in full, with interest per annum at one percent (1%) over the prime rate of interest as published

---

[4]There is an error in the contract, because $163,000 plus $495,000 equals $658,000, not $660,000.

by Pittsburgh National Bank, Pittsburgh, Pennsylvania, determined quarterly, Buyer shall pay Seller fifty percent (50%) of all gross proceeds received by it from any use of the manuscript in the United States or Canada and eighty percent (80%) of all gross proceeds received by it from any use of the manuscript elsewhere, without any deduction or any other charge whatsoever, within thirty (30) days after receipt of same. Seller will apply said payments first to the payment of all unpaid-accrued interest and the remainder to the outstanding principal balance.

    *   *   *   *   *   *   *

 C. * * * The only acts or omissions to act by Buyer, Buyer's successors or assigns (herein called "Obligor") which shall constitute a default by Obligor of said note and security agreement are: (1) Obligor's failure to pay the total principal amount and accrued interest of the non-negotiable promissory note due August 1, 1986, on or before August 1, 1986; or (2) Obligor's failure to comply with the provisions of paragraph 12A hereof. The holder's rights upon the then Obligor's default are limited to the institution and prosecution or [sic] legal action against the then Obligor only (a) to obtain title to and possession of the manuscript subject to any existing enforceable contract and agreements between the then Obligor and all third parties relating to the manuscript which shall be promptly assigned by the then Obligor to Holder; (b) to recover from Obligor any monies due Seller pursuant to Paragraph 12A hereof; and (c) to attach the applicable percentage as described in Paragraph 12A of any unpaid proceeds payable to the then Obligor by any or all of the aforementioned third parties in accordance with said contracts and agreements which shall be promptly assigned by the then Obligor to Holder to the extent the aggregate amount does not exceed the principal balance and unpaid-accrued interest as of August 1, 1986. It is understood and agreed that neither the Obligor nor any of its Partners shall be personally liable in any way for a default of the note due August 1, 1986, or a default of this Agreement. If Buyer defaults, Buyer shall have no obligation whatsoever to return to Seller any proceeds previously received by Buyer which exceed the portion of those proceeds which should have been paid to Seller, in the first instance, i.e., 50% or 80% thereof.

 D. Buyer shall execute such financing statements and other documents as shall be necessary to perfect Seller's security interest in the manuscript.

At the closing, Laurel was to deliver to J. W. Associates "appraisals secured from two or more independent publishers and/or consultants which shall specify that the average estimated potential revenues derivable from the manuscript shall permit Buyer to pay completely its obligations to Seller as evidenced by the non-negotiable promissory note." The agreement further stated: "It is Seller's opinion, based on an appraisal obtained by Seller, that the fair market value of the manuscript as of the Closing Date will be SEVEN HUNDRED THOUSAND ($700,000.00) DOLLARS."

Finally, the agreement provided that Laurel would pay $35,000 of the sale cash proceeds to Resource "[f]or services rendered and funds expended in advising, researching, investigating and analyzing the transaction and in assisting in the selection of Limited Partners of Buyer." An unstated term of the final contract was that Laurel would pay $10,000 as well to the Ultimate Mirror, Ltd. These two payments represented the difference in cash between the $120,000 originally projected on April 15, 1976, and the $165,000 in cash Resource ultimately decided to raise from the limited partners.

Despite the contract's references to attached exhibits "B" and "C" (the draft promissory note and draft security agreement), no such exhibits were attached. The contract was signed by Romero on behalf of Laurel and Romero on behalf of J. W. Associates.

A May 21, 1976, letter from Romero as general partner of J. W. Associates to Romero of Laurel modifies the undated purchase agreement by converting the $35,000 payment to Resource to a $23,000 payment to Resource coupled with $5,000 payments to each of Aranson and Feldman "[f]or legal and accounting services rendered in connection with the structuring of this transaction."

Pursuant to the understanding reached in the April 15, 1976, letter from Rubinstein to Resource, J. W. Associates at some point hired the Ultimate Mirror, Ltd., to act as agent to arrange for distribution of the book and sale of all rights to the book on a nonexclusive basis for a fee of 10 percent of the gross receipts received from the distribution of or sale of the subsidiary rights to the book. In an undated contract, the Ultimate Mirror, Ltd., guaranteed that the partnership would receive a minimum of $2,500 from the agent's sale of subsidiary rights to the book (including television and motion picture rights), or the agent would make up any shortfall.

Romero at some point signed a promissory note for $495,000 from J. W. Associates to Laurel, dated July 1, 1976. The note was due August 1, 1986, and interest on the note was payable at a fixed rate of 8 percent per annum. A schedule attached to the note to record payments of principal and interest thereon contains no entries.

From the end of May through late summer 1976, Resource circulated a private placement memorandum attempting to sell 55 units of limited partnership interest in J. W. Associates

at \$3,000 per unit (for \$165,000 total) to various wealthy individuals. The memorandum, dated May 24, 1976, and 51 pages in length, includes an accountant's projections of taxable income (loss), cash flow, and net after-tax benefits to the limited partners (assuming a 50-percent tax bracket) under three scenarios: (1) The book earns the partnership \$10,000 of proceeds, (2) the book earns the partnership \$300,000 of proceeds, and (3) the book earns the partnership \$1,200,000 of proceeds. The result of these projections, with respect to after-tax benefits, is shown below:

| | After-tax benefit to 55 limited partnership units[5] | | | | |
|---|---|---|---|---|---|
| Proceeds to partnership | 1976 | 1977 | 1978 | 1979 | 1980 |
| \$10,000 | \$168,658 | \$83,888 | \$51,646 | \$23,063 | \$245 |
| 300,000 | 168,658 | 81,465 | 49,224 | 49,224 | 19,698 |
| 1,200,000 | 168,658 | 72,645 | 36,352 | 36,776 | 91,042 |

Another projection, on page 1 of the memorandum, showed that if only the initial 15,000 copies of the book were sold, the yearly tax deduction per unit[6] would be as follows:

| Year | Deduction |
|---|---|
| 1976 | \$6,033 |
| 1977 | 3,000 |
| 1978 | 1,833 |
| 1979 | 800 |

It was estimated that sales of 800,000 to 1,300,000 copies of "An Occult Guide to South America," depending upon the mix of hard cover and soft cover sales and several other factors, would be necessary to fully pay off the nonrecourse note. The memorandum further stated:

The Limited Partnership has no assurance of earning any profits or cash flow. The Limited Partnership does anticipate, however, that each Partner will be entitled to certain items of income tax deduction and credit which may be used to offset other income for 1976 and subsequent years. * * * nor can there be any assurance that the books can be marketed at all, at any price.

Even before the marketing of limited partnership interests in J. W. Associates began, the principals of Resource became

---

[5]These figures do not reflect the \$165,000 outlay the limited partners were required to make to acquire this investment.

[6]The actual chart from which these numbers are derived projects deductions per three units of partnership interest. We have simply divided these figures by three to arrive at our chart.

concerned about the possible passage of a version of the Tax Reform Act of 1976, which, they felt, could make the partnership interests unmarketable. Resource discussed with Rubinstein the possibility of canceling the deal.

On May 10, 1976, Laurel wrote Resource a letter informally setting down the terms of a new deal. Under this letter agreement, eventually signed by both parties, in the event of a change in the tax laws which in Resource's opinion would render the limited partnership interests in J. W. Associates unmarketable, Laurel and Resource would participate jointly as publishers of the book: Resource would only have to supply money necessary to pay third parties to print 15,000 copies of the book. After fully recouping these out-of-pocket expenses from the first distribution proceeds, Resource and Laurel would split the future proceeds 50–50. The Ultimate Mirror, Ltd., would not receive any fee for marketing the work, nor would any non-third-party expenses be paid.

Alternatively, the letter proposed that Resource could elect at any time to cancel the book deal and be responsible to Laurel only for any expenses Laurel had already incurred or become liable for at the time of cancellation.

On June 1, 1976, Rubinstein wrote Resource to inform it that Wilcock was back from South America with the raw materials for the book. Rubinstein asked that, pursuant to the purchase agreement between J. W. Associates and Laurel, the June 1 deposit be made into escrow for Laurel. On June 17, 1976, Rubinstein again wrote Resource asking for the June 1 escrow payment to be made—stating that the payment was presently overdue.

On July 6, 1976, Rubinstein wrote Resource a letter stating that since the June 1 escrow payment had still not been made, Laurel assumed that Resource had concluded the partnership interests were unmarketable: "Laurel is therefore proceeding with the production of the book under the terms of our letter agreement of May 10, 1976 which provides that Laurel and Resource shall participate jointly as publishers of this book."

This last letter surprised and angered Aranson of Resource, who 2 days later wrote Rubinstein that Resource was not canceling the J. W. Associates deal and was not electing either of the alternatives of the May 10, 1976, letter at this time.

Aranson stated that on the basis of recent conversations between the two men, "the agreed upon position was that we would all sit back and do nothing for a few weeks, waiting to see what the climate was."

An understanding was eventually reached in late July between Laurel, Resource, and Wilcock that Resource would not have to make a $25,000 escrow payment in favor of Laurel until after Resource received a legal memorandum from Laurel's attorneys regarding the tax aspects of the J. W. Associates deal in every respect satisfactory to Resource. Four weeks after the delivery of the $25,000 funds into escrow, Resource, "for itself and as Agent for J. W. Associates," *and Resource only*, could elect to (1) terminate all liability of itself and J. W. Associates in connection with the publication of the book—canceling the J. W. Associates-Laurel purchase agreement and forfeiting all sums previously paid to Laurel, (2) proceed for itself with Wilcock and Laurel as joint venturers in the production of the book—eventually (after recouping publication expenses for 15,000 copies) splitting the proceeds of distribution 20 percent to Wilcock, 40 percent to Resource, and 40 percent to Laurel, or (3) proceed with the original J. W. Associates-Laurel purchase agreement modified only to postpone the closing date to no later than November 15, 1976, and changing certain other payment dates.

Ultimately, Resource was satisfied by the legal memorandum it received and proceeded under option three of the above understanding—i.e., it treated the J. W. Associates-Laurel purchase agreement, as modified, as still in effect.

Two 1-page appraisals estimating that the earnings of "An Occult Guide to South America" "could exceed one million dollars" or "could be in excess of one million dollars," but providing no guarantees, were sent to J. W. Associates on November 4, 1976, and October 29, 1976, respectively. The author of the October 29, 1976, appraisal was Acton, Wilcock's agent. The author of the November 4, 1976, appraisal was Thomas L. Dunne, senior acquisitions editor at St. Martin's Press, Inc. These appraisers had been selected by Laurel.

On November 3, 1976, Stein & Day, Inc., received 4,996 hard cover and 10,024 soft cover copies of "An Occult Guide to South America" at its warehouse. On December 16, 1976, J. W. Associates registered a claim to copyright the book with the

U.S. Copyright Office, listing Laurel (not Wilcock) as the book's author and November 4, 1976, as the book's publication date.

Stein & Day, Inc., included "An Occult Guide to South America" in its fall 1976 catalog, published in May 1976. It placed small advertisements (1 column × 49 lines) for the book in the December 19, 1976, issue of the New York Times Book Review, the December 13, 1976, issue of the Village Voice, the December 16, 1976, issue of the Soho Weekly News, and the December 12, 1976, issue of the Pittsburgh Press along with a one-quarter page advertisement in the December 1976, issue of the New York Arts Journal. The advertisement appearing in the Village Voice showed the cover of the book and below it the caption: "*For the first time NY Times* travel writer John Wilcock give you the first comprehensive tour of all the magical, mystical sites in South America. $5.95 Pub. by Laurel Tape and Film, Inc. Stein and Day." The total cost of these advertisements and Stein & Day, Inc.'s expenses in producing them came to $1,260.40. At some point, Stein & Day, Inc., placed announcements of the book's publication in Publishers Weekly and Library Journal—total cost $46.03. Stein & Day, Inc., also charged the partnership about $200 for glossies, review copies (postage and handling), and two press releases. The March 1977 issue of High Times carried a 300-word favorable review of the book.

In March 1977, Stein & Day, Inc.'s promotional people proposed (1) sending copies of the advertisement placed in the New York Arts Journal, with a letter offering a special discount, to travel agents in Westchester, N.Y., and New York City; (2) sending a mailing to South American embassies in Washington, D.C., and (3) placing advertisements in airline magazines, the travel pages of major newspapers, or in the book review section of the New York Times. The last of these steps was not taken.

According to a November 1979 analysis by the Ultimate Mirror, Ltd., actual sales to and returns from bookstores of "An Occult Guide to South America" effected by Stein & Day, Inc., were as follows:

| Period | Gross proceeds | Actual returns |
|---|---|---|
| Nov. 1976 - Dec. 1976 | $3,044.54 | $78.00 |
| Jan. 1977 - Dec. 1977 | 1,056.09 | 1,365.65 |
| Jan. 1978 - Dec. 1978 | 424.48 | 397.56 |
| Jan. 1979 - Sept. 1978 | 1,043.94 | 58.95 |

At least as early as March 1979, J. W. Associates was aware that it was under audit by the Internal Revenue Service. On July 28, 1978, Romero wrote Stein & Day the following two-sentence letter: "Would it be possible to sell some copies of the * * * book at a discount? Do you think this would spur some sales?"

The only sale of subsidiary rights to the book effected by the Ultimate Mirror, Ltd., was a sale of 250 soft cover copies of the book to the author for $375. On September 22, 1976, a German publisher wrote the Ultimate Mirror, Ltd., requesting an 8-week option on the German language rights to the book and a reading copy of the book enabling the publisher to make up its mind on the book. On December 7, 1976, Irvin Shapiro of Films Around The World, Inc., wrote to Laurel Tape & Film, Inc., about the possibility of making a movie out of the book. On January 7, 1980, a Spanish company wrote the Ultimate Mirror, Ltd., requesting the opportunity to handle the Spanish translation rights to the book for a 10-percent fee. Nothing ever came of any of these inquiries, however.

On its partnership account books, J. W. Associates accrued interest liabilities attributable to its nonrecourse note of $12,646 for 1976 and $39,600 for 1977. On March 16, 1977, the partnership issued a check to Laurel for $1,816.01. On the partnership's books, this check was explained as a payment of accrued interest.

On its 1976 Form 1065, J. W. Associates reported gross receipts or sales of $4,859. It claimed a $2,000 accounting expense deduction, a $12,646 interest expense deduction, a $1,227 "Distribution, Commissions" deduction, and a $329,000 amortization deduction. These figures produced a net loss of $340,014. On the depreciation schedule attached to the return, the partnership reported its amortizable property as "Book rights, plates and dies" acquired in 1976. The partnership claimed a $658,000 basis in these assets. Attempting to apply

the so-called income forecast method of accounting, the partnership deducted 50 percent of this basis for amortization.

On its 1977 Form 1065, J. W. Associates reported gross receipts of $438 and interest income of $5. It claimed a $39,600 "Mortgage Interest" deduction, a $614 "Reserve for Returns" deduction, a $153 "Distribution Fees" deduction, and a $131,600 "Amortization Deduction." These figures produced a net loss of $171,524. On the depreciation schedule attached to the return, the partnership, likewise attempting to apply the income forecast method of accounting, deducted 20 percent[7] of the claimed basis of the "Book rights, plates, and dies."

On its 1978, 1979, and 1980 Forms 1065, J. W. Associates reported gross income of ($23), $3,916, and $0, respectively, and net losses of $125,223, $62,017, and $868, respectively.

In a letter accompanying the Schedules K-1 sent to the partners for the taxable year 1977, Resource reported: "The 1977 tax deduction of $3,057.00 per unit is as originally projected. At this time, we estimate the 1978 tax deduction to approximate $1,860.00 per unit which is in accordance with the original projections."

The actual per-unit allocated deductions for 1978 were $2,229. In a letter accompanying the Schedules K-1 sent to the partners for that taxable year, Resource reported: "The deduction for 1978 was approximately $368.00 per unit higher than projected. At this time, we estimate the 1979 deduction to be negligible in accordance with the original projections."

### Scorpio '76 Associates

Prior to 1975, Stein & Day, Inc., was continuously profitable and financed its literary acquisitions from internally generated funds. On January 1, 1975, Stein & Day, Inc., entered into a joint sales agreement with another publisher in which the two companies' sales forces were merged. This merger almost immediately proved to be a financial mistake and caused a severe cash flow problem for Stein & Day, Inc. Consequently, and as a means of raising working capital for his company, in 1975 and 1976, Stein publicly advocated the use of partner-

---

[7]The number shown on the return is 45 percent, but this is an error. Forty-five percent of $658,000 is $296,100. Twenty percent of $658,000 is $131,600, the dollar amount claimed.

ships of outside investors to purchase literary properties from publishing houses.

During 1976, Stein discussed with Rubinstein the possibility of selling several literary properties currently owned by Stein & Day, Inc., to third party investors. For each sale that Rubinstein could bring about, Stein & Day, Inc., would pay Rubinstein a commission. During November and December 1976, Rubinstein, on behalf of Stein & Day, Inc., sold six books to Laurel—"The End of Exurbia," "The Golden Crucible," "The Virile Man," "Forbidden Cures," "Secret Intelligence in the Twentieth Century," and "Up From Nigger"—receiving commissions on each sale ranging from $15,000 to $30,000.

"Up From Nigger" was a book written by Dick Gregory (hereinafter Gregory), a well-known black comedian and political activist, together with a friend, James McGraw. The book was intended as a sequel to Gregory's autobiographical million-copy seller, "Nigger," published in 1964. "Up From Nigger" consists of 38 vignettes recalling various Gregory exploits beginning in 1963, including his campaign for mayor of Chicago, civil rights crusades, his fasts and protests against poverty, and his encounters with famous individuals of the era. In addition to "Nigger," Gregory had published nine other books prior to "Up From Nigger." Some of these other books were quite successful (though none so successful as "Nigger"); others, such as his "Dick Gregory's Bible Tales," did not sell many copies.

Stein & Day, Inc., had purchased the right to publish and distribute "Up From Nigger" from Gregory on August 14, 1974. Under the contract, Gregory received $30,000 as an advance against royalties. Royalties included:

10% of the catalog retail price for the first 5,000 copies.
12½% of the catalog retail price for the next 5,000 copies.
15% of the catalog retail price for all copies above 10,000.
50% of the net proceeds from the sale or license of book club, reprint, selection, abridgement, condensation and second serialization rights.

Gregory retained the first serialization, radio, television, dramatic, and motion picture rights to the book.

Stein had very high hopes for "Up From Nigger." The book was included in Stein & Day, Inc.'s fall 1976 catalog. At the May 1976 sales meeting, Gregory was the only author invited to speak to the sales force about his book. After the sales

meeting, Stein & Day, Inc., put "most of [its] muscle" behind promoting the book.

Much to Stein's surprise, however, advance sales of the book (i.e., sales occurring prior to the publication date of December 1, 1976) were a disappointing 10,717 copies as of October 28, 1976.

Stein & Day, Inc., had hoped to sell the mass market paperback rights to "Up From Nigger" to Pocket Books, the firm which had published "Nigger" in paperback. Pocket Books, though, was not interested in the paperback rights. Stein & Day, Inc., next canvassed several other paperback publishers who also declined to purchase these rights. Finally, Stein prevailed upon Fawcett Publications, Inc., to license the paperback rights for a "modest" $15,000 advance against royalties. The royalties included:

10% of the retail price for the first 150,000 copies.

12½% of the retail price for the next 150,000 copies.

15% of the retail price for all copies above 300,000.

6⅔% of the retail price of copies sold outside the continental United States and Canada.

Fawcett Publications, Inc., agreed "not to publish the book prior to November 1977 nor later than November 1979." This sale, although negotiated earlier, was formalized in a contract between Stein & Day, Inc., and Fawcett Publications, Inc., on December 6, 1976. Under the August 14, 1974, agreement between Gregory and Stein & Day, Inc., Gregory received 50 percent of the $15,000 advance royalty.

At some point in the summer or fall of 1976, Rubinstein suggested "Up From Nigger" to Resource as a literary property suitable for purchase by a Resource-sponsored partnership.

Scorpio '76 Associates was a limited partnership which Resource had helped organize earlier in 1976 in anticipation of finding an appropriate investment. A certificate of limited partnership on behalf of Scorpio '76 Associates was filed with the Department of State of Pennsylvania on June 30, 1976. The certificate names petitioner Markovitz as general partner possessing a 2-percent interest in the partnership's net cash flow, net profits, net losses, and tax credits and Harvey Eger as the sole limited partner with a 98-percent interest in these items.

Markovitz is an attorney and Certified Public Accountant. He acted as the escrow agent for the limited partners' funds in the J. W. Associates partnership and frequently had other dealings with Resource. Although nominally the general partner of Scorpio '76 Associates, Markovitz did little more than acquiesce in all decisions made for the partnership by Resource and sign all necessary papers presented to him by Resource. Resource itself provided all management, bookkeeping, banking, correspondence, and tax return preparation services for the partnership during the years in issue.

Harvey Eger was an attorney who worked for Resource. It was Resource's intention that subscribers to a Scorpio '76 Associates offering would eventually be substituted as limited partners in the partnership through the acquisition of Harvey Eger's 98-percent limited partnership interest.

Markovitz opened a checking account in the partnership's name on June 30, 1976, at the Pittsburgh National Bank with a deposit of $10. Until the period of the acquisition of "Up From Nigger," this $10 constituted the only partnership asset.

Resource chose Scorpio '76 Associates to be the ultimate repository of the publishing rights to "Up From Nigger." Negotiations to acquire these rights began in the fall of 1976, and involved Aranson, Rubinstein, Acton, and Stein (although Stein did not deal directly with Resource). The acquisition was to be structured as follows: Stein & Day, Inc., would sell the rights it owned in "Up From Nigger" to Laurel. Laurel, in turn, would hire Stein & Day, Inc., to distribute the book. Immediately thereafter, Laurel would sell all the rights it acquired in the book to Scorpio '76 Associates, and the partnership would assume Laurel's rights and responsibilities under the distribution agreement. The documents confirming all these various agreements would be dated November 1, 1976.

In an informal letter purchase agreement dated November 1, 1976, Laurel agreed to buy all Stein & Day, Inc.'s right, title, and interest in "Up From Nigger," "together with 15,000 copies of the Work representing the initial printing thereof":

The purchas[sic] price for the Work shall be $953,000.00 payable as follows:

1. $2,500.00 payable upon acceptance of this letter by you [Stein & Day, Inc.].

2. $12,500.00 payable on December 2, 1976.

3. $67,000.00 payable on December 24th, 1976.

4. $720,000.00 in the form of a non-negotiable promissory note, secured solely by the Work and with no person or entity having any personal liability for payment thereof, which note will bear interest at the rate of 8% per annum which will be amortized solely from 44.5% of the net proceeds to Laurel after payment of royalties to Dick Gregory, payment of any agency or distribution fees and a reasonable reserve for reprinting additional copies. Said note is for nine years.

5. $68,000.00 on February 15th, 1977.

The above five figures add up to only $870,000, not $953,000. The mistake in addition is apparently a typographical error: Stein & Day, Inc., was only supposed to be paid $150,000 cash and a $720,000 note (the two items totaling $870,000), while Laurel was to be paid roughly $953,000 on resale of the work to Scorpio '76 Associates. Laurel also agreed to supply Stein & Day, Inc., on December 24, 1976, with $7,500 "for additional space advertising." Further, Stein & Day, Inc., agreed to act as distributor of the book.

An internal memorandum from "Barbara" (a Stein & Day, Inc., employee) to Stein states, in relevant part:

TO:  Sol [Stein]          DATE:  November 4, 1976

SUBJECT:  J. ACTON

Requested information pertaining to sales record, book clubs, serials, etc. on Dick Gregory's UP FROM NIGGER, and any other of his books we've published * * * . The information I returned to them follows:

\*      \*      \*      \*      \*      \*      \*

DICK GREGORY

UP FROM NIGGER, pub. 12/1, first printing 15,000
gross (10/28/76) 10,717

Serial in PLAYBOY

DICK GREGORY'S BIBLE TALES   net (12/75) 13,658
Briar Books (10/28)  5,275

I mentioned to Mr. Acton's secretary that you were disappointed not to have received the material from Philadelphia when promised. She seemed to think it might have been delayed for lack of the above information.

The serial in Playboy, referred to in this note, concerns an excerpt from "Up From Nigger" which was to be published in the December 1976 issue of Playboy. This excerpt constituted a first serialization of "Up From Nigger." Gregory retained all

the rights to the proceeds of the first serialization of "Up From Nigger" under his August 14, 1974, agreement with Stein & Day, Inc. Undated handwritten notes later found in Resource's files state, in part:

*Advance sales*
                \* \* \*
Gregory 10,717
    Serial to Playboy.

printed initally \* \* \*
                15,000

Another internal Stein & Day, Inc., memorandum, also dated November 4, 1976, from Barbara to Stein states, in part:

Mr. Rubenstein (sic) is meeting with his attorneys this afternoon to draw up the documents to purchase THE GOLDEN CRUCIBLE and UP FROM NIGGER. These should be ready tomorrow. He said that he is prepared to pay the deposit. The documents will be two letter agreements which can be replaced by formal agreements later on.

If these documents are ready tomorrow, they should be executed with haste. He has people working overtime tonight to try to complete and will advise in the morning if Jim can pick up. If Jim does pick up, and after you've had a chance to go over and execute (and discuss with him if need be), perhaps Jim could return in the afternoon.

On November 9, 1976, Stein returned a signed copy of the letter purchase agreement to Rubinstein. A Stein & Day, Inc., document entitled "Supersidiary Rights" indicates that Stein & Day, Inc., received its initial $2,500 payment called for under the purchase agreement on November 10, 1976.

In a letter to Laurel dated November 1, 1976, Stein & Day, Inc., agreed to distribute "Up From Nigger" for a fee of 10 percent of gross billings after deductions of "a reasonable reserve for reprinting additional copies" and author's royalties. Laurel allowed Stein & Day, Inc., to retain 35 percent of gross receipts as a reserve against returns. The 10-percent distribution fee was lower than the 15-percent distribution fee Stein & Day, Inc., would ordinarily have charged. This lower fee reflected a volume discount given by Stein & Day, Inc., because Laurel was simultaneously acquiring five other books from Stein & Day, Inc., and hiring Stein & Day, Inc., as distributor of each. Finally, in the letter agreement, Stein & Day, Inc., acknowledged receipt of 15,000 copies of the book to be distributed, starting immediately.

For services rendered by Rubinstein in connection with Stein & Day, Inc.'s sale of "Up From Nigger" to Laurel, Stein

& Day, Inc., pursuant to a letter agreement dated November 4, 1976, agreed to pay the Ultimate Mirror, Ltd., $25,000.

In an informal letter agreement between Scorpio '76 Associates and Laurel, dated November 1, 1976, the partnership agreed to purchase all of Laurel's rights in "Up From Nigger," "together with 12,500 copies of the Work representing the initial printing thereof":

> The purchase price for the Work shall be $953,000.00 payable as follows:
> 1. $2,500.00 in cash or certified funds, payable upon acceptance of this letter by you, which funds are enclosed herewith;
> 2. $17,500.00 in cash or certified funds on November 25, 1976;
> 3. $106,000.00 in cash or certified funds on or before December 24, 1976;
> 4. $720,000.00 in the form of a non-negotiable Promissory Note, secured solely by the Work, and with no person or entity having any personal liability for the payment thereof, which Note will bear interest at the rate of 8% per annum, and which will be amortized solely from one-half of the net proceeds to the Partnership after the payment of royalties to Dick Gregory and a reasonable reserve for reprinting additional copies;
> 5. $107,000.00 in cash or certified funds on February 15, 1977.

Scorpio '76 Associates agreed to assume Laurel's rights and obligations under the distribution agreement and to pay Stein & Day, Inc., the $7,500 for additional advertising. In turn, Laurel agreed to pay, out of the cash proceeds received, $33,000 to Resource for its services in securing limited partners for Scorpio '76 Associates and $5,000 each ($15,000 total) to Aranson, Feldman, and Edward Ging (Resource's three principals) "for their legal accounting and financial services to the Partnership in connection with the acquisition of the Work and structure of the transaction."

The 12,500 copies of the book referred to as the initial printing in this letter agreement differs from the 15,000 copies referred to as the initial printing in the above-described purchase and distribution agreements between Stein & Day, Inc., and Laurel. Due to the slow, advance sales of "Up From Nigger," at some point Stein had decided to reduce the initial printing of the book from 15,000 to 12,500 copies and to save $3,700 to $4,000 in printing costs.

Scorpio '76 Associates paid Laurel the initial $2,500 due under this contract on November 2, 1976. The partnership paid Laurel the November 25, 1976, $17,500 installment on December 3, 1976, and the December 24, 1976, $106,000 installment on December 17, 1976. To help finance these

partnership payments during the period when the funds from the limited partners had not yet been received, the partnership borrowed money from GAF Realty, Inc. An "Underwriting Agreement" among Scorpio '76 Associates, Resource, Laurel, and GAF Realty, Inc., dated November 1, 1976, states: "Agreements for acquisition of Book from Seller [Laurel] were entered into December 2, 1976."

Both the Stein & Day, Inc.-Laurel purchase agreement and the Laurel-Scorpio '76 Associates purchase agreement were replaced by more formal agreements dated November 1, 1976, and signed on or after December 24, 1976. These formal documents substantively differ only slightly from the prior letter agreements:

In the case of the formal Stein & Day, Inc.-Laurel purchase agreement, the aggregate purchase price was correctly stated to be $870,000. The initial printing of the book was reduced from 15,000 to 12,500. The formal agreement states that the $720,000 promissory note shall be substantially in the form of attached "Exhibit C" secured by a purchase money security interest in the book substantially in the form of attached "Exhibit D." The attached "Exhibits C and D," however, are a promissory note and security agreement running from Scorpio '76 Associates to Laurel—not Laurel to Stein & Day, Inc. There was no $720,000 note from Laurel to Stein & Day, Inc. In connection with the note, the agreement stated:

9. A. Until the promissory note is paid in full, with interest per annum at eight percent (8%) Buyer shall pay Seller forty-four and one-half percent (44½%) of all gross proceeds received by it from any use of the Book after deduction of a reasonable reserve for reprinting additional copies of the said Book, of royalties payable to the author of the said Book, and of distribution fees owing to Stein and Day, Incorporated,. Distributor of the said Book. * * * Seller will apply said payments first to the payment of all unpaid-accrued interest and the remainder to the outstanding principal balance.

Gross proceeds as used herein shall mean those funds received by Buyer from the Distributor or other ancillary sources as may be reduced by all of the distributors deductions and allowances or returns, and the Distributors commission; A reserve for returns of books of not more than 35%, and such sums as may be necessary to provide a reserve for the reprinting of additional copies of the Book as may be determined by Buyer.

\* \* \* \* \* \* \*

C. * * * The only acts or omissions to act by Buyer, Buyer's successors or assigns (herein called "Obligor") which shall constitute a default by Obligor hereunder are: (1) Obligor's failure to timely pay all amounts due under

Paragraph 4 of this Agreement [the cash portion of the purchase price]; (2) Obligor's failure to pay the total principal amount and accrued interest of the promissory note due on or before August 1, 1986; or (3) Obligor's failure to comply with the provisions of paragraph 9A hereof. The holder's rights upon the then Obligor's default are limited to the institution and prosecution of legal action against the then Obligor only (a) to obtain title to and possession of the Book subject to any existing enforceable contract and agreements between the then Obligor and all third parties relating to the Book which shall be promptly assigned by the then Obligor to Holder; (b) to recover from Obligor any monies due Seller pursuant to Paragraph 9A hereof; and (c) to attach the applicable percentage as described in Paragraph 9A of any unpaid proceeds payable to the then Obligor by any or all of the aforementioned third parties in accordance with said contracts and agreements which shall be promptly assigned by the then Obligor to Holder to the extent the aggregate amount does not exceed the principal balance and unpaid-accrued interest as of August 1, 1986. It is understood and agreed that neither the Obligor nor any of its Partners [sic] shall be personally liable in any way for a default of the note due August 1, 1986, or a default of this Agreement. If Buyer defaults, Buyer shall have no obligation whatsoever to return to Seller any proceeds previously received by Buyer which exceed the portion of those proceeds which should have been paid to Seller, in the first instance, i.e., 44½% thereof.

D. Buyer shall execute such financing statements and other documents as shall be necessary to perfect Seller's security interest in the Book.

Stein & Day, Inc., did not accrue $720,000 as a note receivable on its books because Stein believed its payment was subject to too many contingencies.

The formal purchase agreement between Scorpio '76 Associates and Laurel differs from the informal letter agreement only in the following respects: The aggregate purchase price is increased by $500 to $953,500; the payments by Laurel to resource and its three principals are equally increased $500 to a total $48,500; the payment schedule for the $233,500 in cash to go to Laurel is rearranged—$2,500 on signature, $17,500 on or before November 25, 1976; $100,500 on or before December 24, 1976, and $113,000 on or before February 15, 1977 (although the first three payments had already been made according to the different informal agreement schedule); the note from Scorpio '76 Associates to Laurel is no longer payable from 50 percent of net proceeds to the partnership, but rather bears the identical payment terms and is subject to the identical default terms as the note in the Laurel-Stein & Day, Inc., formal agreement (except that the reserve for returns allowed in the Scorpio '76 Associates agreement is 25 percent

rather than 35 percent). There is no "Exhibit E" (the distribution agreement between Laurel and Stein & Day, Inc.) to this contract.

At some point, Markovitz signed a promissory note for $720,000 from Scorpio '76 Associates to Laurel dated November 1, 1976, and due August 1, 1986. A schedule attached to the note to record payments of principal and interest thereon contains no entries.

At the time Scorpio '76 Associates purchased "Up From Nigger" from Laurel for $953,500, Rubinstein told Aranson that appraisals for the total purchase price would be forthcoming. Two 1-page appraisals estimating that, based on the sales of "Nigger," earnings to the partnership on "Up From Nigger" "could be in excess of one-million dollars" or "might well be in excess of one million dollars," but providing no guarantees, were sent to Scorpio '76 Associates c/o Laurel on December 22, 1976, and December 23, 1976, respectively; the appraisers were, respectively, Acton and Thomas L. Dunne, and had been chosen by Laurel.

Resource circulated a 61-page private placement memorandum, dated November 15, 1976, in an attempt to sell 25 units of limited partnership interest in Scorpio '76 Associates. Each unit could be purchased for $9,880. This would produce total cash to the partnership of $247,000. The memorandum stated that the $247,000 would be paid out as follows: $233,500 to Laurel for purchase of "Up From Nigger," $7,500 as an advertising fund, $4,000 to Markovitz for "accounting fees for accounting and tax services," and $2,000 for accounting fees to Leon Rubenstein. The memorandum includes an accountant's projections of taxable income (loss), cash flow and net after-tax benefits to the limited partners (assuming a 50-percent tax bracket) under three assumptions: namely, that (1) the book earned the partnership $50,000, (2) the book earned the partnership $600,000, and (3) the book earned the partnership $2,300,000. The result of these projections, with respect to after-tax benefits is shown below:

| | After-tax benefit to 25 limited partnership units[8] | | | | |
|---|---|---|---|---|---|
| Proceeds to partnership | 1976 | 1977 | 1978 | 1979 | 1980 |
| $50,000 | $221,587 | $147,140 | $75,438 | $47,894 | $1,374 |
| 600,000 | 235,064 | 150,298 | 73,392 | 73,392 | 48,962 |
| 2,300,000 | 276,717 | 159,947 | 124,877 | 160,553 | 160,553 |

Under the same three assumptions, the memorandum estimated that taxable income (deductions) per unit would be as follows:

| | Taxable income (deductions) | | | | |
|---|---|---|---|---|---|
| Proceeds to partnership | 1976 | 1977 | 1978 | 1979 | 1980 |
| $50,000 | ($16,738) | ($11,222) | ($5,815) | ($3,612) | $110 |
| 600,000 | (6,937) | (5,430) | (3,234) | (3,234) | (1,280) |
| 2,300,000 | 23,357 | 12,479 | 5,262 | 5,262 | 5,262 |

It was estimated that it would be necessary for Scorpio '76 Associates to realize in excess of $1,618,000 in net receipts from distribution to retire the $720,000 note with interest and that this would at least require the sale of 720,000 hard cover books. The memorandum further stated:

The Limited Partnership has no assurance of earning any profits or cash flow. The Limited Partnership does anticipate, however, that each Partner will be entitled to certain items of income tax deduction and credit which may be used to offset other income for 1976 and subsequent years. * * * nor can there be any assurance that the books can be marketed at all, at any price.

Prior to and subsequent to the publication date of "Up From Nigger," Gregory promoted the book in cities he was passing through on the college lecture circuit. Stein & Day, Inc., helped arrange local radio, television, and newspaper interviews for Gregory in some of these cities.

Stein & Day, Inc., placed a large combined advertisement entitled "Complete the titles of these 5 new books" for five of the six books it had sold to Laurel (including "Up From Nigger") in the December 16, 1976, issue of the New York Times, the December 23, 1976, issue of the Soho Weekly News, and the December 29, 1976, issues of the Los Angeles Times and the Chicago Tribune. The total cost of these advertisements (for all five books) was $14,082.66. Stein & Day, Inc., spent several hundred dollars more on behalf of "Up From

---

[8] These figures do not reflect the $247,000 outlay the limited partners were required to make to acquire this investment.

Nigger" for placing publication announcements in Publishers Weekly and Library Journal and sending out copies of the book to reviewers. The distributor placed a full-page combined advertisement entitled "Cut out this ad ' for 10 books, including all six books it had sold to Laurel, in the New York Times Book Review of April 17, 1977, for an aggregate cost of $4,586.77 attributable to the Laurel books.

"Up From Nigger" was reviewed, at Stein & Day, Inc.'s solicitation, in the New York Times Book Review on December 26, 1976. The reviewer was mildly hostile to the book, calling it a "slight and self-admiring memoir," praising the author's humor, but criticizing the accuracy of his reporting on people and events. The book was also reviewed in two minor newspapers as well as in the September 17, 1977, issue of the Amsterdam News.

According to Stein & Day, Inc., royalty invoices sent to Gregory's agent, actual hardcover sales of "Up From Nigger" were as follows:

| Period ending | Copies sold | Copies returned |
|---|---|---|
| Dec. 31, 1976 | 11,874 | 6 |
| June 30, 1977 | 2,665 | 3,310 |
| Dec. 31, 1977 | 1,037 | 1,551 |
| June 30, 1978 | 268 | 480 |
| Dec. 31, 1978 | 157 | 135 |
| June 30, 1979 | 109 | 48 |

No additional copies beyond the initial 12,500 hardcover copies of the book were ever printed.

Fawcett Publications, Inc., published "Up From Nigger" in paperback on January 31, 1978. As of October 19, 1981, the paperback version had sold 35,250 copies, and distribution had ceased. This number of copies was sufficient to "earn" Stein & Day, Inc., only $6,655.87 in royalties. Since Stein & Day, Inc., had already received from Fawcett Publications, Inc., $15,000 as an advance against royalties, Stein & Day, Inc., received no further payments from the paperback publisher on account of "Up From Nigger."

The only sale of subsidiary rights to "Up From Nigger" effected by Stein & Day, Inc. (beyond the licensing agreement with Fawcett Publications, Inc.), was a sale of certain unspecified rights in the book to Scholastic Magazine for $25. Gregory was entitled to half the proceeds of this sale.

In remitting checks to the partnership as per its distribution agreement with Laurel, Stein & Day, Inc., withheld 35 percent of gross proceeds as a reserve against returns.

On its partnership account books, Scorpio '76 Associates accrued interest liabilities attributable to its nonrecourse note to Laurel of $8,931 for 1976 and $57,600 for 1977. On July 5, 1977, the partnership made out a certified check for $17,756.97 directly to Stein & Day, Inc. On the partnership's books, this payment was explained as a payment of the $8,931 in accrued 1976 interest and a reduction in the principal amount of the $720,000 note of $8,826. On December 13, 1977, the partnership made out a check for $3,321.36 directly to Stein & Day, Inc. On the partnership's books, this last payment was allocated entirely to the satisfaction of the partnership's accrued interest liability.

On its 1976 Form 1065, Scorpio '76 Associates reported gross receipts or sales of $44,337. It claimed a $2,000 accounting expense deduction, an $8,931 interest expense deduction, a $7,500 advertising expense deduction, a $4,434 "Distribution Commissions" deduction, a $4,000 administrative expense deduction, and a $429,075 amortization deduction. These figures produced a net loss of $411,603.

On its 1977 Form 1065, Scorpio '76 Associates reported gross receipts or sales of $19,161. It claimed a $165 "Author Royalties" deduction, a $2,973 "Reprint Expense" deduction, a $1,743 "Reserve for Returns" deduction, a $57,600 interest expense deduction, a $1,148 "Distribution Fees" deduction, a $75 administrative expense deduction, and a $238,375 amortization deduction. These figures produced a net loss of $282,918. On the depreciation schedule attached to the return, the partnership reported its amortizable property as "Book Rights, Plates & Dies" acquired in 1976. The partnership claimed a $953,500 basis in these assets. By attempting to apply the income forecast method of accounting, the partnership deducted 25 percent of this basis for amortization.

On its 1978, 1979, and 1980 Forms 1065, Scorpio '76 Associates reported gross income of ($998), $0, and $85 respectively, and net losses of $181,869, $95,350, and $779, respectively.

The actual per-unit allocated deduction for 1978 was $7,202. In a letter accompanying the Schedules K-1 sent to the

partners for that taxable year, Resource reported: "The deduction for 1978 was approximately $1,387.00 per unit higher than projected. At this time, we estimate the 1979 deduction to be approximately $3,500.00 per unit which is in accordance with the orginal projections."

The actual per-unit allocated deduction for 1979 was $3,776. In a letter accompanying the Schedules K-1 sent to the partners for that taxable year, Resource reported: "The deduction for 1979 was in accordance with the original projection. At this time, we estimate the 1980 deduction to be negligible in accordance with the original projections."

## OPINION

Respondent determined that none of the petitioners may deduct in 1976 or 1977 alleged losses arising out of the book publishing activities of two partnerships, J. W. Associates and Scorpio '76 Associates.

The first issue we address is an evidentiary one. Respondent has attempted to introduce both testimony and exhibits pertaining to a host of other limited partnerships organized by Resource. Respondent urges us to observe numerous alleged similarities in the operation of these partnerships and the operation of J. W. Associates and Scorpio '76 Associates. Petitioners argue that evidence concerning these other partnerships is irrelevant or at least should be excluded because its probative value is substantially outweighed by its potential for unfair prejudice and confusion of issues. See rule 403, Fed. R. Evid.

In *Brannen v. Commissioner*, 78 T.C. 471, 512 (1982), on appeal (11th Cir., Aug. 23, 1982), respondent argued that a limited partnership was not engaged in owning and distributing a motion picture as a profit-seeking activity. See sec. 183. The general partner of the partnership and the president of the corporation which sold the movie to the partnership had together organized 19 other motion picture limited partnerships during the same period. None of these other partnerships earned income in an amount in excess of the cash paid in by the partners for the purchase of their partnership interests. In determining whether the partnership before the Court had engaged in its motion picture activity for profit, we considered

one relevant factor to be the profit history of the 19 other limited partnerships.

In the instant case, respondent has determined that neither J. W. Associates nor Scorpio '76 Associates engaged in its book publishing activities for profit. Under the authority of *Brannen*, therefore, it would appear that at least the information respondent seeks to introduce about other Resource-sponsored book publishing partnerships is relevant. But the evidence respondent seeks to introduce with regard to these other entities is sketchy and incomplete. To consider fairly the profit history of these other partnerships, we would have to examine the underlying cause of the financial results in each partnership. This would greatly expand the scope of our inquiry and, in effect, require us to try the cases of all these other partnerships simultaneously with the case of the instant two partnerships. Principles of efficient judicial administration would not be served by such a course, especially since the evidence relating to these other Resource-sponsored partnerships is only of collateral significance. Consequently, we hold that while the evidence relating to other partnerships may be relevant, it will (except as it transactionally relates to J. W. Associates and Scorpio '76 Associates) not be considered.

## I. Section 183

One of respondent's principal arguments is that both J. W. Associates and Scorpio '76 Associates did not engage in their book publishing activities with the intention of making a profit. Accordingly, respondent argues, the limited partners may deduct various claimed expenses at most only to the extent allowable under section 183.[9] Petitioners, conversely,

---

[9]Sec. 183, in relevant part, provides:

SEC. 183. ACTIVITIES NOT ENGAGED IN FOR PROFIT.

(a) GENERAL RULE.—In the case of an activity engaged in by an individual or an electing small business corporation (as defined in section 1371(b)), if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section.

(b) DEDUCTIONS ALLOWABLE.—In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed—

(1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and

(2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds

argue that the partnerships were carrying on trades or businesses or engaging in profit-seeking activities and so are not within the purview of section 183.

As we pointed out in *Brannen v. Commissioner, supra* at 500, section 183 is not a disallowance provision, but rather allows a taxpayer to deduct certain expenses which, because the taxpayer is not engaged in a trade or business or an activity for which deductions are allowable under paragraphs (1) and (2) of section 212, he could not otherwise deduct. In the instant case petitioners recognize that, except for their claimed interest deductions, all deductions claimed from J. W. Associates and Scorpio '76 Associates in 1976 and 1977 are fully deductible only if the partnerships in those years engaged in trades or businesses or activities for which deductions are allowable under paragraphs (1) and (2) of section 212. Otherwise, under section 183(b)(2) these non-interest deductions would be allowable only to the extent of gross income less interest expenses allowable under section 183(b)(1).

Whether a partnership is engaged in a trade or business or an activity for which deductions are allowable under paragraphs (1) and (2) of section 212—i.e., the question of whether or not it is an "activity * * * not engaged in for profit" (see sec. 183(a))—is determined at the partnership level. *Siegel v. Commissioner*, 78 T.C. 659, 698 (1982); *Brannen v. Commissioner, supra* at 505. To fall outside section 183, the instant partnerships must establish that they engaged in their book publishing activities with an actual and honest profit objective. Rule 142(a); *Dreicer v. Commissioner*, 78 T.C. 642, 644–645 (1982), affd. ___F.2d ___(D.C. Cir. 1983). While a reasonable expectation of profit is not required, the taxpayer's profit objective must be bona fide. *Bessenyey v. Commissioner*, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967). Both parties agree that the inquiry turns on whether the primary purpose and intention of the partnerships in engaging in the activities

---

the deductions allowable by reason of paragraph (1).

(c) ACTIVITY NOT ENGAGED IN FOR PROFIT DEFINED.—For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212.

was to make a profit. *Hager v. Commissioner*, 76 T.C. 759, 784 (1981), and cases cited therein.

Section 1.183-2(b), Income Tax Regs., lists some of the relevant factors to be considered in determining whether an activity is engaged in for profit. These factors include: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved.

The issue is one of fact to be resolved not on the basis of any one factor, but on the basis of all the facts and circumstances. *Lemmen v. Commissioner*, 77 T.C. 1326, 1340 (1981); *Allen v. Commissioner*, 72 T.C. 28, 34 (1979). Greater weight is given to objective facts than to the parties' mere statements of their intent. *Siegel v. Commissioner, supra* at 699; *Engdahl v. Commissioner*, 72 T.C. 659, 666 (1979).

Partnerships present a special problem in applying section 183. When section 183 is applied to a partnership, it is not as simple whose intent we are probing as is the case with an individual. Partnerships are mere formal entities. Obviously, they do not have independent minds of their own. Nevertheless, in previous cases we have constructed a "partnership intent" by reasoning backward from the numerous objective factors listed in section 1.183-2(b), Income Tax Regs. See *Wildman v. Commissioner*, 78 T.C. 943, 953-954 (1982); *Siegel v. Commissioner, supra; Brannen v. Commissioner, supra; Hager v. Commissioner, supra*. This method produces a collective partnership intent.

In *Wildman, Siegel, Brannen*, and *Hager* we looked at the actions taken by the general partners of each limited partnership to determine each such partnership's profit motive. These individuals were the ones who actually ran all partnership

affairs and whose expertise was relied on in making partnership decisions.[10] In the case of J. W. Associates and Scorpio '76 Associates, however, much of our focus must be on Resource, which, though not the general partner of either partnership, in effect ran both of these partnerships' affairs. The nominal general partners of J. W. Associates and Scorpio '76 Associates were Romero and Markovitz, respectively, but the record is clear that for expertise, purchase negotiations, and partnership management, these men merely relied on Resource to do all that was necessary.

With the parameters of our inquiry now in focus, we proceed to apply the tests of section 183 to the separate facts of each partnership.

## A. J. W. Associates

The first factor provided by the regulation is the manner in which the taxpayer carried on the activity. Sec. 1.183–2(b)(1), Income Tax Regs. Petitioners contend that J. W. Associates conducted its publishing activities in a business-like fashion, acquiring a book by a well-known author, negotiating for it at arm's length, paying a reasonable price (supported by expert appraisals), hiring an expert distributor, keeping careful books and records and making all necessary State and Federal filings for the marketing and recording of limited partnership interests.

Two of the above assertions are true: Stein & Day Inc., was a reputable publisher and distributor with considerable expertise; Wilcock, although not a household name, had authored or coauthored several books which sold well (though none in the million-seller range). The remaining assertions, however, have either not been proven or are irrelevant.

A closer examination of J. W. Associates' conduct of its publishing venture reveals the following:

First, the partnership (represented by Resource) agreed to pay Laurel an amount of money calculated (a) by determining the amount of cash necessary to acquire the text of a book

---

[10]Generally, under the Unif. Limited Partnership Act, limited partners wishing to retain their limited partnership status, with its concomitant limited liability, do not manage or act for the partnership. See sec. 7, Unif. Limited Partnership Act; see also sec. 303, Rev. Unif. Limited Partnership Act (1976).

from Wilcock ($25,000), (b) by adding to this number the amount of money necessary to print 15,000 copies of this book (about $60,000), (c) by further adding several large amounts of cash to "compensate" the various promoters of the transaction—Resource ($23,000), Aranson ($5,000), Feldman ($5,000), Laurel ($15,000), the Ultimate Mirror, Ltd. ($10,000), Acton ($5,000), Laurel's attorneys ($10,000)—and (d) by tripling this amount to arrive at the face amount of a nonrecourse note necessary to produce large tax benefits for the limited partners.

The price was hardly arrived at through arm's-length bargaining. The negotiators on behalf of J. W. Associates had little or no incentive to keep down the cost: they were not paying the price, but were actually receiving a percentage of it (20 percent of $165,000 is exactly 33,000—the amount which Resource and its principals ended up with). Romero, J. W. Associates' figurehead general partner, equally received, through Laurel, the benefit of any inflated price and so had no motive to reject on behalf of the partnership any excessive expenditure. The size of the nonrecourse note was, we infer from the original letter of April 15, 1976, not decided by negotiation, but rather determined unilaterally by Resource. The correction of the April 15 letter by the April 19 note, stating that the size of the note would be determined through mutual negotiation, we find tainted with the pervasive disingenuousness characteristic of the entire series of transactions in this case. As long as the nonrecourse note was sufficiently large in comparison to the cash portion of the purchase price such as to achieve anticipated tax benefits, such benefits would make the limited partners essentially unconcerned about the nominal aggregate purchase price.

Petitioners' attempt to explain the purchase price by pointing to appraisals received over 6 months after the deal was struck further demonstrates the absence of profit motive in the purchase price. At the time of the purchase agreement (probably in the spring of 1976), Resource agreed to pay $658,000 for "An Occult Guide to South America" merely on the assurance by Laurel and Acton that the book was worth this amount—or would be worth more than this amount at the time of the closing. Resource had no prior experience in buying books; neither did Rubinstein nor, apparently, did Romero.

Acton was Wilcock's agent—certainly not a disinterested individual. At the time, Resource sought no other advice as to the real worth of the book. In our view, this was totally inconsistent with business-like conduct in light of the large sums of money ostensibly at stake in the transaction.

Under the purchase agreement, Laurel was to deliver at the closing two or more appraisals from independent publishers or consultants specifying that "the average estimated potential revenues derivable from the manuscript shall permit Buyer to pay completely * * * the non-negotiable promissory note." J. W. Associates did in fact receive two 1-page appraisals at the closing. One of those appraisals, however, was by Acton—Wilcock's agent. Both of the appraisals said only that the book *could* generate $1 million of earnings, not that it might be expected to. These appraisals were not what was called for in the purchase agreement, yet there is no indication the partnership ever objected to receiving them. We are totally unconvinced that the partnership relied at all on these after-the-fact appraisals.

The record is devoid of evidence showing that the purchase price for the book paid by J. W. Associates to Laurel was in any way determined with a "true regard for the profitability of the activity." *Brannen v. Commissioner, supra* at 509. The negotiations were conducted only with a view toward benefiting both the promoters (in cash) and potential limited partners (in tax benefits). Whether the book's revenues could actually bear the burden of such a purchase price was of no apparent concern to the parties.

Beyond the purchase price, there are many other indications that the book publishing venture was not conducted in a businesslike manner. According to the private placement memorandum, sales of the book would have to be in the range of 1 million copies to pay off the full purchase price, yet it seems clear from the record that the partnership never intended to print and distribute more than 15,000 copies—an amount which would be insufficient even to return the initial cash investment.

Stein & Day, Inc., was left with the impression that it was hired to distribute only 15,000 copies of "An Occult Guide to South America." Consequently, the distributor charged J. W. Associates a higher than usual percentage distribution fee.

Stein was told not to spend more than $5,000 on advertising the book. In fact, much less was spent on advertising and promotion. The minimal advertising campaign—including one small item in one issue of each of a handful of newspapers and periodicals—was hardly a campaign commensurate with the promotion of a bestseller. Unlike the enthusiastic expert distributor in *Siegel v. Commissioner, supra* at 702, Stein had "severe reservations" about the book. His lack of enthusiasm is quite obviously manifested in the meager advertising campaign he and his staff devised.

Further evidence that the partnership only intended to print and sell 15,000 copies comes from the letters written by Resource to the limited partners accompanying their 1977 and 1978 Schedules K-1. In these letters, Resource stated that losses were in accordance with, or slightly greater than, "original projections." The private placement memorandum shows at least four different sets of projections of income and/or tax deductions based on vastly different potential sales. The projections based on the sale of only 15,000 books, however, appear on page one of the memorandum. A comparison of the numbers in the letters with the various private placement memorandum projections makes it clear that the original projections to which the letters refer are the ones involving the sale of only the 15,000 books. The substance of these letters, totally acquiesced in by the petitioners for all that appears in the record before us, are tantamount to admissions by petitioners that unwarranted tax deductions solely motivated their participation in the J. W. Associates partnership.

In summary of this point, both the dealings with Stein & Day, Inc., and the letters from Resource to the limited partners convince us that the partnership never intended or even desired to print and distribute more than the initial run of 15,000 books. The sale of only 15,000 books would not make this venture profitable.

Further evidence of lack of businesslike conduct is the partnership's hiring of the Ultimate Mirror, Ltd., Rubinstein's company, to find a distributor for the book and to handle the sale of subsidiary rights for a 10-percent fee. This arrangement makes no sense from a business point of view: Rubinstein was not expert in the sale of book rights. His efforts in that regard

apparently produced only the sale of 250 soft cover copies of the book to Wilcock. We also fail to see why it was necessary to pay Rubinstein such a potentially large fee for merely introducing the partnership to Stein & Day, Inc. (We note it was Acton who actually located Stein & Day, Inc., as a potential distributor.) The only explanation we can see for the hiring of the Ultimate Mirror, Ltd., as the partnership's agent was to provide another avenue of potential revenue to a promoter of the venture.

In addition, the Ultimate Mirror, Ltd., guaranteed that the partnership would receive a minimum of $2,500 from the sale of subsidiary rights. There is no evidence in the record, however, that the partnership ever pursued this guarantee when the Ultimate Mirror, Ltd., failed to achieve this minimum amount of subsidiary rights income.

Other unbusinesslike conduct included: (1) The apparent silence of the partnership when Resource and Laurel from May through July 1976 considered tearing up the partnership's purchase agreement with Laurel at the option of Resource only (it appears that the partnership itself was barred from making this election), (2) the failure of the partnership to keep complete copies (if there ever were any) of its important agreements and to date or fill in the blanks on those documents, and (3) the partnership's failure to notice that the interest rate on the $495,000 promissory note it signed was a fixed 8 percent instead of the floating rate of 1 percent above prime called for in the purchase agreement.

Among the other factors relevant to the section 183 inquiry, we have already touched on the fact that neither Romero, Rubinstein, nor Resource had much knowledge of the publishing business. What expertise they sought out to distribute the book (that of Stein & Day, Inc.) was unenthusiastic about the book's prospects. See sec. 1.183–2(b)(2), Income Tax Regs. There was also no expectation that the book property would appreciate in value over time; see sec. 1.183–2(b)(4), Income Tax Regs; the partnership expected to realize most of the income from the book by the end of 1977 as is evident from their 50–20–10–10–10 five-year depreciation schedule allegedly prepared according to the income forecast method of accounting.

The partnership experienced continuous, uninterrupted losses from the activity which were extremely useful to the high-bracket limited partners herein. See sec. 1.183–2(b)(6), (7), and (8), Income Tax Regs. In fact, projections from the private placement memorandum show that the after-tax benefits to a limited partner in a 50-percent bracket would be identical in the first year whether the partnership earned $10,000 or $1,200,000. In the second and third years, after-tax benefits would actually *increase* if the partnership sold fewer books. Since earnings of $1,200,000 would have entailed a bestseller, which "An Occult Guide to South America" was not programmed to be, such a tax structure lends weight to the conclusion that the publication of the book was not conducted with an actual and honest profit objective. *Dreicer v. Commissioner, supra* at 644–645.

In summary, based on all the facts adduced, petitioners have failed to meet their burden of showing that J. W. Associates engaged in its book publishing activity for profit. Accordingly, the deductions claimed by petitioners attributable to J. W. Associates are limited by the provisions of section 183.

## B. Scorpio '76 Associates

As with J. W. Associates, petitioners contend that the Scorpio '76 Associates publishing venture was engaged in with an honest and actual profit objective. They point out that "Up From Nigger" was written by a well-known author and was distributed by an expert distributor, Stein & Day, Inc. They further contend that the partnership (1) negotiated for the book at arm's length, (2) bought the work for a reasonable price (supported by expert appraisals), and (3) carefully kept books and records and made all necessary State and Federal filings for the marketing and recording of limited partnership interests. We disagree with these last three contentions.

First, with regard to the alleged businesslike conduct of the partnership, we note that Gregory originally sold most of his rights in "Up From Nigger" to Stein & Day, Inc., for a $30,000 advance against royalties. Stein & Day, Inc., sold its rights, together with 12,500 already printed copies of the book, to Laurel for $150,000 plus a $720,000 nonrecourse note. Out of the $150,000 cash received by Stein & Day, Inc., Rubinstein, through the Ultimate Mirror, Ltd., received $25,000. Laurel immediately resold the work to Scorpio '76 Associates for

$233,500 in cash and the $720,000 nonrecourse note. The additional $83,500 in cash paid by the partnership went $35,000 to Laurel and $48,500[11] to Resource (the three Resource principals each receiving $5,000 out of Resource's share). The cash portion of the purchase price, therefore, appears to have been computed on the basis of the cash requirements of each of the promoters, not on the basis of what the book's likely sales prospects were in early November 1976. In addition, the $720,000 note is roughly 3 times the size of the cash payment made to Laurel ($720,000 ÷ 3 = $240,000)—a necessary cash-to-note ratio to make the book venture an attractive investment to the limited partners, taxwise.

Unlike "An Occult Guide to South America," "Up From Nigger" was purchased several months after advance sales of the work had begun. Prior to May 1976, it would have been hard to say whether "Up From Nigger" would sell as well as its predecessor, "Nigger." By early November 1976, however, it was clear that "Up From Nigger" would not sell many copies without a major advertising campaign directed at the public. As of October 28, 1976, advance sales of the book were only 10,717.

We are satisfied that the individuals negotiating on behalf of the partnership in November 1976 were aware of the book's small advance sales. An internal Stein & Day, Inc., memorandum of November 4, 1976—prior to the date Stein & Day, Inc., actually sold the book—shows that Acton, who was working with Rubinstein, asked for information concerning the total advance sales of "Up From Nigger" and total regular sales of another book by Gregory which Stein & Day, Inc., had recently published. The memorandum suggests that Laurel, at least, had been unwilling to enter the deal without such information and had been holding up preparing documents until it got such information. An undated paper containing handwritten notes was later found in Resource's files with the precise information regarding advance sales of "Up From Nigger" which Stein

---

[11]We deem it significant that $48,500 is almost exactly 20 percent of the $247,000 in cash raised from the limited partners. As in the case of J. W. Associates, we believe that Resource here intended to take 20 percent of the cash raised from the limited partners—a fact which would discourage Resource from seeking the lowest possible price in any negotiation with Laurel on behalf of the partnership.

& Day, Inc., communicated to Acton. Petitioners have not shown that this information did not come into Resource's possession prior to its arranging for the partnership to purchase the work.

That Resource knew the book was encountering slow advance sales at the time of the partnership's purchase is also evident from the documents formalizing such purchase. Documents prepared early in November 1976, such as the informal Laurel-Stein & Day, Inc., purchase agreement and the Laurel-Stein & Day, Inc., distribution agreement later assumed by the partnership, show the initial printing of the book to be 15,000 copies. The informal Laurel-Scorpio '76 Associates purchase agreement and all of the formal documents show the initial printing to be 12,500 copies. Stein & Day, Inc., was already scaling back its production of the book to reflect demand. Resource saw this and said nothing. The partnership neither requested a reduction in the $953,500 purchase price to reflect actual demand nor asked for a price reduction from Stein & Day, Inc., to reflect the several thousand dollars of printing costs saved by such a cutback.

It is clear that neither Resource nor Markovitz had any expertise in the area of valuing a book. See sec. 1.183–2(b)(2), Income Tax Regs. Nevertheless, they sought no disinterested outside expert advice before causing the partnership to spend nearly $1 million for the book. They merely took Laurel's word that the selling price was reasonable and accepted, well after the purchase had been completed, so-called expert appraisals supplied by Laurel saying the book "could" or "might" generate revenue in excess of $1 million.

Most significantly, however, after sinking hundreds of thousands of dollars of cash in this investment (not to mention the nonrecourse note), the partnership conducted, in the words of respondent's expert, an "apathetic" advertising campaign directed at the general public. If there was any chance of making the book a success after the partnership bought it, it would have had to be through an aggressive advertising campaign going over the heads of the skeptical book wholesalers to the general public. No such aggressive campaign was conducted. The book was merely left to wither and die as one of 6 or 10 Stein & Day, Inc., fall offerings sporadically publicized in a handful of newspapers.

Petitioners suggest that Stein & Day, Inc., was the expert on the subject of advertising on which they depended, but Stein, himself, had given up on "Up From Nigger" about the time he sold it. He testified that by December 31, 1976, there seemed to be no need to print any more copies beyond the initial 12,500. The willingness of the partnership to abandon all hope of recouping its investment so soon after it purchased the property and its failure to even suggest to Stein that he try a little harder to make back at least the near quarter-million dollars in cash the partnership had only recently invested suggests that more was afoot than mere deferrence to expertise. Rather, it indicates that the partnership never really cared whether the book venture turned a profit or not.

Other evidence of lack of businesslike conduct of Scorpio '76 Associates includes the failure of the partnership to record its actual interest and principal payments on the schedule attached to its promissory note and its failure to object to Stein & Day, Inc.'s retaining a 35-percent reserve against returns, whereas the Laurel-Scorpio '76 Associates formal purchase agreement provides for a 25-percent reserve.

That the partnership did not intend to make a success out of the publication of "Up From Nigger" is further borne out by the letters Resource sent to accompany the 1978 and 1979 Forms K-1. In these letters, Resource reported that the actual partnership deductions were higher than or in accordance with "original projections." The private placement memorandum shows hypothetical gross earnings projections for the book of $50,000, $600,000, and $2,300,000, yet the "original projection" to which the K-1 letters refer is clearly only the $50,000 gross earnings projection.[12]

Turning to other factors in the section 183 inquiry, there was no expectation that "Up From Nigger" would appreciate in value over time. See sec. 1.183–2(b)(4), Income Tax Regs. Scorpio '76 Associates expected to realize 70 percent of the

---

[12]We deduce this fact from a comparison of the figures in the letters with the figures in the private placement memorandum. For example, in 1978 the actual per-unit allocated deduction was $7,202, which the letters described as $1,387 higher than the original projections. According to the private placement memorandum, in the case of gross earnings of $50,000, the projected deduction would be $5,815 per unit—which is exactly $7,202 minus $1,387.

book's income (as is evident from the "income forecast" amortization schedule chosen) by December 31, 1977.

The partnership experienced continuous, uninterrupted losses from the activity which were extremely useful to the high-bracket limited partners herein. See sec. 1.183–2(b)(6), (7), and (8), Income Tax Regs. The private placement memorandum gave assurances that these substantial tax deductions could be anticipated to offset other income, whether or not the book could be marketed at all.

Based on all the facts and circumstances, we hold that Scorpio '76 Associates has not met its burden of showing that it engaged in its book publishing venture with an honest and actual profit objective. Accordingly, the deductions claimed by petitioners attributable to Scorpio '76 Associates are limited by the provisions of section 183.

---

A final note on section 183. The legislative history of section 183 makes it clear that it was not generally meant to apply to individuals engaged in highly speculative activities—such as investors in wildcat oil wells. S. Rept. 91–552 (1969), 1969–3 C.B. 490; see also sec. 1.183–2(a), Income Tax Regs. Investing in books can be such a highly speculative activity, and thus it could be argued that section 183 should never apply to book publishing ventures.

The testimony of Stein and various experts in this case convinces us that a book's value prior to the time it is actually marketed to book dealers is highly speculative and subject to profound misjudgment even by the most knowledgeable in the publishing industry. Further we are impressed with Stein's testimony and the testimony of the various experts herein that a book does not sell itself, but must be aggressively marketed if anything like best-seller status is sought.

We have found section 183 applicable to the facts before us not because petitioners invested in a speculative venture and lost, but because the record makes it evident that petitioners paid bestseller prices for books they had no intention of promoting into bestsellers, and in the case of "Up From Nigger," purchased a book they knew at the time of purchase was fast becoming a commercial failure. The partnerships made these large purchases with no real expertise or disinter-

ested advice. They projected large tax losses and they were not disappointed. These were not bona fide attempts at profitable book publishing.

## II. Section 163

In 1976 and 1977, J. W. Associates accrued[13] and deducted $12,646[14] and $39,600,[15] respectively, as interest on its $495,000 note to Laurel. In 1976 and 1977, J. W. Associates actually paid Laurel $0 and $1,816.01, respectively, as interest on this note.

In 1976 and 1977, Scorpio '76 Associates accrued and deducted $8,931[16] and $57,600,[17] respectively, as interest on its $720,000 note to Laurel. In 1976 and 1977, Scorpio '76 Associates actually paid Laurel[18] $0 and $12,252.36,[19] respectively, as interest on this note.

Respondent challenges the deduction of any interest paid or accrued by the two partnerships in 1976 and 1977 on two separate grounds: First, that the nonrecourse notes underlying such payments were not true liabilities of the partnerships

---

[13]Both with respect to J. W. Associates and Scorpio '76 Associates, partnership books and records make it clear that the interest deductions were calculated as if the partnerships were on the accrual basis in 1976 and 1977. Neither party has requested a finding of fact that the partnerships in fact operated on the accrual basis, the cash basis, or any other basis of accounting permitted in sec. 446 in those years. Accordingly, we have made no finding on this subject. For purposes of sec. 163, however, we assume the partnerships were accrual basis taxpayers since respondent has raised no argument to the contrary.

[14]It is unclear on what basis this figure was computed. It may represent 8-percent simple interest from some date in early September 1976 to the end of 1976 (8 percent being the interest rate stated on the face of the note). Alternatively, it may reflect a floating interest rate (pursuant to the J. W. Associates-Laurel purchase agreement) from an unspecified date in 1976.

[15]This figure is 8 percent of $495,000.

[16]This figure represents 8-percent simple interest on the note from some day in early November 1976.

[17]This figure represents 8-percent simple interest on a $720,000 principal balance for all of 1977. Scorpio '76 Associates' books, however, show that $8,826 of a $17,756.97 payment made July 5, 1977, was credited to reduction of principal on the note. Accordingly, the principal balance was not $720,000 for all of 1977, and the interest deduction calculated on the basis of that figure is overstated by several hundred dollars.

[18]The payments were only constructively made to Laurel. In fact, the partnership wrote interest and principal payments directly to Stein & Day, Inc., in satisfaction of an identical $720,000 obligation Laurel had to Stein & Day, Inc., under the Laurel-Stein & Day, Inc., purchase agreement.

[19]This figure is the sum of $8,931 (the portion of the July 5, 1977, payment of $17,756.97 [see note 17 *supra*] credited to interest on Scorpio '76 Associates' books) and $3,321.36, the interest payment made Dec. 13, 1977.

which could give rise to interest deductions. Second, that the "all events" test (see sec. 1.451–1(a), Income Tax Regs.) precludes deduction of any accrued but unpaid interest since the obligation to pay interest was contingent on the existence of sale proceeds and there was never a reasonable possibility that the necessary sale proceeds would be realized.

Petitioners, on the other hand, argue that the notes were bona fide nonrecourse debts supported by expert appraisals and arrived at through arm's-length negotiation between unrelated parties. Consequently, they contend, they are entitled to accrue interest on such notes.[20]

We agree with respondent that both of the instant nonrecourse notes were too contingent or speculative to be considered true liabilities of the partnerships and that therefore interest may not be accrued on such notes.

In order to qualify for a section 163 deduction there must be a genuine indebtedness: To justify an interest deduction, a taxpayer must actually pay for the use or forebearance of money. *Norton v. Commissioner*, 474 F.2d 608, 610 (9th Cir. 1973), affg. a Memorandum Opinion of this Court.

There are various approaches which may be taken in establishing whether a purchaser may treat a nonrecourse liability as a bona fide debt. One, originating in *Estate of Franklin v. Commissioner*, 544 F.2d 1045 (9th Cir. 1976), affg. 64 T.C. 752 (1975), indicates that when the amount of the aggregate purchase price unreasonably exceeds the value of the property securing the note (or when the principal amount of the note unreasonably exceeds the value of the property securing the note),[21] the debt will not be recognized. In such

---

[20]In light of our disposition of the sec. 183 issue, we need only consider, here, the extent to which the partnerships are entitled to interest deductions which exceed the gross income of the partnerships in 1976 and 1977. If the partnerships are not entitled to interest deductions greater than their gross incomes each year, then, under sec. 183(b), the partnerships will have no distributable losses. J. W. Associates claimed interest deductions larger than its gross income in both 1976 and 1977. Scorpio '76 Associates claimed interest deductions in excess of its gross income only in 1977.

[21]The test stated within the parenthetical above was that employed in *Hager v. Commissioner*, 76 T.C. 759, 773–774 (1981), while the test in the main body of the sentence was the one employed more recently in *Brannen v. Commissioner*, 78 T.C. 471, 493 (1982), on appeal (11th Cir., August 23, 1982). Since we do not apply the *Estate of Franklin* line of cases here, we need not resolve which test is the correct one. See discussion in *Odend'hal v. Commissioner*, 80 T.C. 588, 604 n. 7 (1983).

instance, the purchaser acquires no equity in the property by making payments and, therefore, would have no economic incentive to pay off the note. *Estate of Franklin v. Commissioner, supra* at 1048–1049. The *Estate of Franklin* analysis, comparing the purchase price and size of the note to the fair market value of the property at the time of purchase, originated in real estate transactions (see *Estate of Franklin v. Commissioner, supra*; *Narver v. Commissioner*, 75 T.C. 53 (1980), affd. per curiam 670 F.2d 855 (9th Cir. 1982); *Beck v. Commissioner*, 74 T.C. 1534 (1980), affd. 678 F.2d 818 (9th Cir. 1982)), but has also been applied to the purchase of cattle (see *Hager v. Commissioner, supra*), and, more recently, to movies (see *Wildman v. Commissioner, supra*; *Siegel v. Commissioner, supra*; *Brannen v. Commissioner, supra*).

Another line of cases, in many ways complimentary to the above, more closely addresses the problem of bona fide loans where the sole security for such loans is a speculative asset with an undeterminable value at the time of purchase. This line of decisions holds that highly contingent or speculative obligations are not recognized for tax purposes until the uncertainty surrounding them is resolved. *CRC Corp. v. Commissioner*, 693 F.2d 281 (3d Cir. 1982), revg. and remanding on other grounds *Brountas v. Commissioner*, 73 T.C. 491 (1979);[22] *Brountas v. Commissioner*, 692 F.2d 152, 157 (1st Cir. 1982), vacating and remanding on other grounds 73 T.C. 491 (1979); *Gibson Products Co. v. United States*, 637 F.2d 1041 (5th Cir. 1981); *Denver & Rio Grande Western R.R. Co. v. United States*, 205 Ct. Cl. 597, 505 F.2d 1266 (1974); *Lemery v. Commissioner*, 52 T.C. 367, 377–378 (1969), affd. on another issue 451 F.2d 173 (9th Cir. 1971); *Inter-City Television Film*

---

[22]Although in *Brountas v. Commissioner*, 73 T.C. 491 (1979), vacated and remanded 692 F.2d 152 (1st Cir. 1982) and revd. and remanded sub nom. *CRC Corp. v. Commissioner*, 693 F.2d 281 (3d Cir. 1982), we held that because of sec. 636, certain nonrecourse notes in a speculative oil drilling venture were required to be treated as true liabilities for tax purposes, we also said:

"Leaving aside for the moment the provisions of section 636, we would consider it highly doubtful that a pre-drilling production payment on an exploratory or so-called wildcat well, even when cross-collateralized with other wildcat wells, or any similar nonrecourse, highly contingent obligation would be a 'liability' for purposes of section 752(a). [73 T.C. at 559.]"

The reversals in *Brountas* were predicated on a different reading of sec. 636 by the Courts of Appeals. However, both the First Circuit in *Brountas v. Commissioner*, 692 F.2d at 158, and the Fifth Circuit in *Gibson Products Co. v. United States*, 637 F.2d 1041, 1049 (1981), quoted the above sentence from the Tax Court opinion in *Brountas* with approval.

*Corp. v. Commissioner*, 43 T.C. 270, 287 (1964); *Albany Car Wheel Co. v. Commissioner*, 40 T.C. 831 (1963), affd. per curiam 333 F.2d 653 (2d Cir. 1964). For example, in *Lemery v. Commissioner, supra,* we held that an obligation to pay $444,335.17 of the $1,131,000 stated purchase price of a business only out of future "net profits" was too contingent to be included in the purchaser's amortizable basis.[23] Similarly, in *Denver & Rio Grande Western R.R. Co. v. United States, supra,* the Court of Claims refused to allow the taxpayer to include in its basis an obligation to repay customer advances (used to build a spur line) payable only out of the taxpayer's revenues from shipping above a certain annual tonnage during each of the following 10 years. And in *Inter-City Television Film Corp. v. Commissioner, supra,* we stated that a $1,250,000 obligation to a seller of certain television and movie exhibition rights, payable only out of various percentages of gross receipts in excess of $2,400,000, was not a part of the buyer's cost basis in such rights.

This line of cases was recently followed by the Third Circuit (to which nine of the petitions herein are appealable) in *CRC Corp. v. Commissioner, supra.* In that case, a limited partnership purchased packages of oil and gas leasehold interests together with fixed price no-out turnkey drilling contracts for cash payments and nonrecourse notes. The nonrecourse notes were secured by the leaseholds and equipment used in the resulting wells. The notes and accrued interest thereon were payable solely out of oil and gas produced by the leaseholds or the proceeds of the sale of the leaseholds and equipment. The court stated that "as a practical matter, the payment of the nonrecourse note[s] [was] contingent upon the discovery of recoverable amounts of gas or oil," and that as a result, the notes were subject to "the rule that speculative or contingent liabilities may not be accrued and deducted." 693 F.2d at 283.

---

[23] In *Lemery v. Commissioner,* 52 T.C. 367, 377–378 (1969), affd. on another issue 451 F.2d 173 (9th Cir. 1971), we also rejected the purchaser's argument that a liability in a fixed amount whose payment is wholly contingent is to be treated differently from a liability possessing no stated face amount whose payment is wholly contingent.

Accord *Brountas v. Commissioner*, 692 F.2d at 157–158, 161–162; *Gibson Products Co. v. United States, supra* at 1046–1049.

In the present case, we find the nonrecourse notes given by J. W. Associates and Scorpio '76 Associates to be at least as contingent and speculative as the notes given in *CRC Corp.*, *Inter-City Television Film Corp.*, and *Lemery*. Despite the attempts by both parties to put objective values on the respective publishing rights acquired, we think this is a case where no objective fair market value was determinable for these rights as of the date of purchase. J. W. Associates purchased its right to publish "An Occult Guide to South America" both before the book was written and before any promotional efforts had been undertaken. Scorpio '76 Associates purchased its rights in "Up From Nigger" before the book's official publication date, before reviews had been solicited, and before advertisements directed at the public had been placed, but after seriously disappointing advance sales. We have previously discussed the poor prognosis for the success of this book at the time of its acquisition by the partnership. Under the circumstances of the acquisition previously described, to say that the nonrecourse note secured by this property was "contingent and speculative" would be a major understatement. In our opinion, the note was all but worthless at its inception.

The simple fact is that all parties to the various purchase agreements viewed the notes, in the words of Aranson, as "contingent compensation [to Laurel] against its purchase price should the book be successful." The parties may have hoped the notes could be paid, but refused to give the limited partners "any assurance that the books can be marketed at all, at any price." The notes and accrued interest were only payable out of the sales proceeds and were secured by the publishing rights. If the books failed, the notes and interest would never be fully paid. These notes were simply not obligations which the partnerships could accrue for tax purposes, and consequently, no interest deduction for accrued

but unpaid[24] interest on such notes is allowable. *Brountas v. Commissioner*, 692 F.2d at 162.[25] See also *Saviano v. Commissioner*, 80 T.C. 955, and *Graf v. Commissioner*, 80 T.C. 944, both decided this day, in which we held that repayments of certain nonrecourse obligations were so contingent that they could not be treated as loans for tax purposes.

In light of our dispositions of the sections 183 and 163 arguments, we need not reach any of respondent's other arguments for disallowing petitioners' deductions relating to J. W. Associates and Scorpio '76 Associates in 1976 and 1977.

Accordingly,

> *Decisions will be entered for the respondent in docket Nos. 3593–81, 3600–81, 6169–81, 6342–81, 9460–81, 9462–81, 12191–81, 12192–81, 12194–81, and 20703–81.*

> *Appropriate orders will be entered in docket Nos. 5029–81, 5632–81, 6996–81, 9256–81, 15663–81, and 15664–81.*

---

[24]We make no holding as to the proper tax treatment of the actual "interest" payments made by the partnerships in each year. It is unnecessary to decide whether these payments were deductible under sec. 163 or sec. 162 or required to be capitalized as part of the acquisition cost of the book rights because even if these actual payments were deductible under sec. 163, under sec. 183(b), the partnerships would not have distributive losses in 1976 and 1977. See note 20 *supra*.

[25]Our opinion is not changed by the recent United States Supreme Court opinion in *Commissioner v. Tufts*, 461 U.S. ___(1983), which held that where a taxpayer disposes of property encumbered by nonrecourse indebtedness in an amount that exceeds the fair market value of the property, the Commissioner may require him to include the outstanding amount of the obligation in his amount realized. The Supreme Court, relying upon the Commissioner's treatment and over 35 years of judicial sanction, held that the debt should be treated as a true loan. The instant situation does not fit within the context of *Tufts* and *Crane v. Commissioner*, 331 U.S. 1 (1947). Our decision is based on the unreasonably and artificially inflated amount of the nonrecourse indebtedness which was not the fact in *Tufts*.