DONALD FELDMAN AND PATRICIA FELDMAN, a/k/a PATSY JANE FELDMAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Feldman
Docket No. 20906-87
United States Tax Court
T.C. Memo 1993-17; 1993 Tax Ct. Memo LEXIS 20; 65 T.C.M. (CCH) 1747; January 14, 1993, Filed *20 Decision will be entered for respondent. For Donald Feldman, Petitioner: Harry J. Kaplan. [1] For Patricia Feldman, Petitioner: Murray B. Weil, Jr.
For Respondent: William B. McCarthy and Leonard T. Provenzale. PARR
PARR
MEMORANDUM FINDINGS OF FACT AND OPINION PARR, Judge: Respondent determined the following deficiencies in, increased interest, and addition to petitioners' Federal income tax: Increased Interest and
Addition to Tax
Year
Deficiency
Sec. 6621(c)
Sec. 6651(a)(1)
1974
$ 50,461.82
[1]
-
1975
112,363.87
[1]
$ 15,417.13
1976
31,643.00
[1]
-
1977
11,159.00
[1]
-
1978
4,798.00
[1]
-
1979
238.00
-
-
1980
1,599.00
[1]
-
The issues for decision are: (1) Whether petitioners should be allowed distributive losses and credits attributable to three investments: Essex Associates, Cambridge *21 Associates, Ltd., and Berkeley Group, Ltd.; (2) whether petitioners are bound by their consent to extend the statute of limitations; (3) whether petitioners are liable for increased interest on substantial underpayments attributable to tax motivated transactions under section 6621(c); [2] (4) whether petitioners are liable for additions to tax for failure to timely file their tax return for tax year 1975 under section 6651(a)(1); and (5) whether Patricia Feldman, a.k.a. Patsy Jane Feldman, is entitled to relief as an innocent spouse. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts, together with the attached exhibits, is incorporated herein by this reference. At the time they filed their petition, petitioners resided as husband and wife in Miami, Florida. References to petitioner *22 in the singular are to Donald Feldman. Petitioners timely filed their joint income tax returns for tax years 1974 and 1976 through 1980. Prior to the issuance of the notice of deficiency on April 2, 1987, petitioners executed consents to extend the period of limitations for the following tax years: Date of
Date of
Date
Tax Year
Form 872
Form 872-A [3]
Extended to
1974
12/02/77
12/31/78
1974
11/21/78
12/31/80
1974
09/10/80
1975
01/18/79
06/30/81
1975
09/10/80
1976
04/18/79
06/30/81
1976
09/10/80
1977
09/10/80
1978 [1]
08/24/82
1979 [1]
07/07/83
1980 [1]
08/13/84
*23 Petitioners did not file any Notices of Termination of Special Consent to Extend the Time to Assess Tax (Form 872-T) for any of the above-mentioned years. Petitioner graduated from Cornell University in 1956 and, after attending law school at Stanford and New York University, graduated from the University of Miami Law School in 1960. Petitioner has been licensed to practice law in the State of Florida since 1960. He is also a member of the following bars: the United States Supreme Court, the United States Court of Appeals for the Fifth Circuit, the United States Court of Appeals for the Eleventh Circuit, and the Federal Trial Bar of the United States District Court for the Southern District of Florida. Petitioner's employment experience has centered around the practice of law. He reported compensation from Feldman and Abramson, P.A., and its successors for all of the years in issue. The last law practice partnership in which petitioner was involved was terminated because of substantial personal obligations he and his partner incurred to cover the high costs of litigating a large medical malpractice case, which was pending appeal at the time of this trial. Since the termination *24 of his partnership, petitioner has been employed by several law firms in Florida. Patricia Feldman's higher education consists of two summer sessions and one full academic year at Glenville State Teacher's College in West Virginia, where she took secretarial courses. Mrs. Feldman has also taken some courses in fundraising, leadership development, ceramics, and interior design. She worked as an insurance "advisor" for her husband's law firm. This job entailed giving employees information on handling insurance claims and filling out forms, advising them as to what was being done in relation to their claims, and maintaining contact with the insurance companies on the progress of the claims. In the last 15 years, Mrs. Feldman has spent a majority of her time doing volunteer work for various organizations including the Greater Miami Jewish Federation, homeless centers, and the Kidney Foundation, of which she is a board member. Mrs. Feldman was diagnosed with kidney disease in 1979 and subsequently underwent a kidney transplant in 1985. As a result, she currently must maintain costly and extensive medical insurance to cover her substantial ongoing medical expenses. Her medical condition *25 limits her ability to work full-time. In June 1974, petitioner along with his law partner, John Abramson, invested in Essex Associates (hereinafter Essex), a Florida limited partnership. [4] Essex was involved in the business of leasing data processing equipment, furniture, and other unspecified equipment. Petitioners claimed the following distributable losses as deductions: $ 64,587, $ 9,725, $ 11,018, and $ 803 for the years 1974, 1975, 1976, and 1977, respectively. Petitioners also claimed deductions for investment interest expense in the amounts of $ 10,647, $ 1,074, and $ 950 for tax years 1977, 1978, and 1979, respectively. In addition to Essex, petitioner and Abramson *26 also invested in Cambridge Associates, Ltd. (hereinafter Cambridge), a Florida limited partnership, in November 1974. Lea J. Marks was designated as the general partner; Jonathon J. Marks was designated as Trustee General Partner. Petitioner and Abramson formed a partnership, Feldman & Abramson Partnership, which purchased one unit for $ 33,750, a 4.68% ownership interest. Cambridge owned the distribution rights to the motion picture "Dirty Money", which was produced in France in 1972. Cambridge subsequently granted to Allied Artists Picture Corporation the right to distribute the movie in return for a stated percentage of the gross rental receipts. Early in 1975, petitioner received a copy of a letter from Allied Artists, directed to the Markses, stating that "Dirty Money" would only gross approximately $ 5,000 throughout its lifetime. In response, petitioner wrote Lea Marks requesting assurances that, as general partner, she was "doing everything possible to see that the interests of all the limited partners are [were] sufficiently protected." Petitioners claimed the following distributable losses as deductions: $ 27,459, $ 43,850, $ 351, $ 340, $ 270, $ 296, and $ 210 for *27 the years 1974, 1975, 1976, 1977, 1978, 1979, and 1980, respectively. In May 1975, petitioner and Abramson separately invested in Berkeley Group, Ltd. (hereinafter Berkeley), a Florida limited partnership. Lea and Jonathon Marks were again designated as general partner and trustee general partner, respectively. The initial capitalization of the partnership was $ 607,500. Lea Marks was to contribute $ 2,500, with sales of 20 limited partnership interests generating $ 605,000. Of the initial capitalization, $ 305,000 was to be used as a "down payment" and to prepay interest on a note for a film, described below, and the remaining $ 302,500 was to be paid either directly to Lea Marks or to defray her or the partnership's expenses, or as a sales commission to the corporation of which she was a principal owner and her husband the president. Berkeley owned the distribution rights to the motion picture "Swept Away", which was produced in Italy in 1974. The purchase price paid by Berkeley to Marbex Finance, Ltd. for these distribution rights was $ 3,385,000, of which $ 3,234,000 was a nonrecourse note. Of the first $ 100,000 of net proceeds received by Berkeley, 100 percent had to *28 be paid to Marbex on the nonrecourse note. Thereafter, 65 percent of the net proceeds would go to Marbex on payment of the note. Petitioners purchased 1-1/2 units for $ 45,375, a 7.125 percent-ownership interest. The Berkeley private placement memorandum acknowledges that the film would have to generate $ 9.4 million of the distributor's theatrical gross receipts (gross receipts from rentals to theater owners) in order to pay off the principal amount of the partnership note. The memorandum stated that 80 percent of theatrical revenues (distinguished from television and "ancillary market" [5] revenues) could be expected to be earned in the first 18 months of distribution. Distributors' fees were 70 percent of theatrical revenues, net of expenses, and 50 percent of other rental revenues net of expenses. Distributors' fees were 25 percent of network television receipts and 40 percent of other television receipts, before expenses. Expenses of television distribution were further charges against owners' shares. *29 Although gross revenues from "Swept Away" were very good, petitioner was concerned because the film lacked adequate promotion and advertising. Petitioner contacted the general partners on a regular basis expressing his view that increased promotion would yield higher revenues, and asking for a detailed response. In addition, petitioner and Abramson eventually solicited and purchased radio advertisements when the film was playing in Miami, using their own funds. Subsequently, the holder of the nonrecourse note, Marbex, foreclosed and repossessed the rights to the film. Petitioners claimed the following distributable losses as deductions: $ 135,331, $ 50,195, $ 10,528, $ 6,417, $ 3,671, and $ 2,896 for the years 1975, 1976, 1977, 1978, 1979, and 1980, respectively. During the years in issue, petitioner gambled compulsively in both the securities and commodities markets. Between the years 1974 and 1980, petitioner lost between $ 200,000 and $ 300,000 on these activities. Although the commodities and securities brokerage accounts were in the name of Donald Feldman and Patricia Feldman during the years in question, Mrs. Feldman was not aware of the extent of her husband's losses. *30 The statements of some accounts were sent to petitioner at his office. His secretary would compile the stock and commodity transactions, in addition to income items from the firm, for petitioners' tax returns. Patricia Feldman was aware of her husband's initial investments in the commodities market, which were successful. However, she did not write any of the checks to purchase commodities or interests in the limited partnerships. She was also aware of her husband's investments in the limited partnerships. A majority of the investments in limited partnerships were made from the law firm accounts. The investment in Berkeley was in both petitioners' names. The investment in Cambridge was made by petitioner and Abramson on behalf of the law partnership, the investment in Essex by petitioner alone. Mrs. Feldman maintained and wrote a majority of the checks on petitioners' joint bank account. She also performed the monthly reconciliations on the account. In addition to bank reconciliations, Mrs. Feldman would compile all of her and her husband's expenses that qualified as itemized deductions on their income tax returns. When the preparation of the tax returns was completed, *31 she would verify and cross-check the information she had submitted to the certified public accountant. Mrs. Feldman signed all of the tax returns for the years in issue. Respondent issued a notice of deficiency on April 2, 1987, for tax years 1974 through 1980. In the notice, respondent disallowed the deduction of losses distributed to petitioner by Essex, Cambridge, and Berkeley for the years in issue. Respondent determined that it was not established that the losses were incurred in a trade or business or with respect to property held for the production of income. Respondent similarly disallowed other deductions and credits distributed to petitioner by each of the limited partnerships. OPINION Respondent determined deficiencies in petitioners' Federal income tax for the taxable years 1974 through 1980. Respondent's determination is presumed correct, and petitioners bear the burden of proving respondent erred. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). Petitioners must show that they entered into a transaction that had economic substance or business purpose. Rice's Toyota World, Inc. v. Commissioner, 81 T.C. 184, 209 (1983), *32 affd. on this issue 752 F.2d 89, 91-92 (4th Cir. 1985). Claimed Deductions and Losses
Section 183(a)[6] provides that deductions arising from an activity "not engaged in for profit," as defined in section 183(c), shall not be allowed, except as provided in section 183(b). If the activity is not engaged in for profit, section 183(b) separates the claimed deductions into two categories. Section 183(b)(1) allows only those deductions which are not dependent upon a profit motive, such as interest and taxes. Section 183(b)(2) allows the balance of the deductions which would otherwise be permitted only if the activity was engaged in for profit but only to the extent that the gross income derived from the activity exceeds the allowable deductions under section 183(b)(1). *33 The determination of whether a partnership is engaged in a trade or business or in an activity for which deductions are allowable under section 212 is made at the partnership level. Fox v. Commissioner, 80 T.C. 972 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984); Brannen v. Commissioner, 78 T.C. 471 (1982), affd. 722 F.2d 695 (11th Cir. 1984). Petitioner's profit motive as a limited partner is not determinative. Where investment activities are carried on by a limited partnership, the activities of the general partner(s) determine whether the partners have engaged in an activity for profit. Fox v. Commissioner, supra at 1008. To fall outside section 183, the taxpayer must prove that the general partner engaged in the activities in issue with an actual and honest profit objective. Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without published opinion 702 F.2d 1205 (D.C. Cir. 1983). While a reasonable expectation of profit is not required, a bona *34 fide objective of realizing a profit must exist. Taube v. Commissioner, 88 T.C. 464, 480 (1987). In determining whether an activity is engaged in for profit, the following factors are to be considered: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to that activity; (7) the amount of occasional profit, if any, which is earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. Sec. 1.183-2(b), Income Tax Regs. A record of losses over the years and the unlikelihood of achieving a profitable operation are important factors bearing on the taxpayer's true intention. Sec. 1.183-2(b)(6), Income Tax Regs.
Because petitioners are claiming deductions and losses from three separate investments, we will analyze each limited partnership *35 individually. a. Essex Associates
Respondent determined that the losses and deductions attributable to Essex should be disallowed because the investment lacked economic substance. Respondent similarly determined that the nonrecourse note executed by the partnership lacks economic substance and does not represent a bona fide debt obligation. Petitioners bear the burden of proving respondent erred in her determination. Rule 142. To determine whether there was profit motive, it is necessary to analyze the motives and objectives of the promoters and the general partners in the formation and operation of the partnership, because it is the entity that engages in the business, not the limited partners. Therefore, the general partners operate the partnership business and are the persons whose expertise is relied upon to make partnership decisions. Fox v. Commissioner, 80 T.C. 972, 1007-1008 (1983); Brannen v. Commissioner, 78 T.C. 471, 512 (1982). In this investment, petitioner was a limited partner. Petitioners failed to give any evidence regarding the actual business activities conducted by the limited partnership. *36 Except for introducing the partnership returns and Schedules K-1 issued by the partnership, petitioners did not introduce any evidence that substantiated the alleged business purpose of the partnership, i.e., leasing of data processing and other business equipment. In addition, petitioners did not introduce any evidence establishing the identity or necessary profit motive of the general partner(s). Therefore, we conclude that petitioners failed to prove that their investment in Essex had economic substance or business purpose. Rice's Toyota World, Inc. v. Commissioner, 81 T.C. at 209. We accordingly disallow all deductions and credits claimed by petitioners in relation to Essex for the tax years in issue and thereby uphold respondent's determination of deficiencies in that respect. b. Cambridge Associates, Ltd.
Respondent determined that the losses, deductions, and credits attributable to Cambridge should be disallowed because the investment lacked economic substance. Respondent similarly determined that the nonrecourse note executed by the partnership lacks economic substance and does not represent a bona fide debt obligation. Petitioner *37 and his partner, Abramson, purchased a limited partnership interest in Cambridge. Therefore, petitioner must introduce evidence of the general partner's profit motive in order to prove the investment possessed the requisite economic substance. Fox v. Commissioner, supra; Brannen v. Commissioner, supra.
Petitioners have failed to meet their burden of proof as to Cambridge's economic viability. First, no credible evidence was introduced that substantiates Cambridge's actual ownership rights in "Dirty Money". The acquisition agreement introduced by petitioners is a poorly constructed collection of papers, none of which give any information on Cambridge's financial obligations. In addition, petitioners did not introduce any evidence regarding the general partner's profit motive or the promotion of the partnership. To the contrary, a majority of the evidence and testimony introduced regarding the partnership establishes a lack of profit motive on the part of the general partner. First, petitioner received a letter from Allied Artists, the distributor of "Dirty Money", addressed to the general partner stating *38 that the film's potential box office receipts were dismal. Petitioner testified that he realized from the letter that the general partner, Lea Marks, was not committed to the film's success. Petitioner even wrote the general partner asking for assurances that she was doing everything possible to protect his interest as a limited partner. Based on the testimony and lack of any evidence establishing the general partner's profit motive, we find that the Cambridge investment lacked economic substance. In accordance, respondent's determination is upheld. c. Berkeley Group, Ltd.
Respondent determined that the losses, deductions, and credits attributable to Berkeley should be disallowed because the investment lacked economic substance. Respondent similarly determined that the nonrecourse note executed by the partnership lacks economic substance and does not represent a bona fide debt obligation. Petitioners purchased a limited partnership interest in Berkeley. Accordingly, they bear the burden of proving that the investment possesses the requisite economic substance. This is achieved by substantiating the general partner's profit motive. Fox v. Commissioner, supra. *39 Petitioners have failed to meet this burden as to the Berkeley investment. The testimony and evidence produced at trial leads us to conclude that the general partner, Lea Marks, lacked the requisite profit motive. There are several factors which lead us to our conclusion. First, petitioner wrote a letter to Lea Marks regarding the Cambridge investment, expressing his concerns and asking for assurances as to his interests. Petitioner even testified that he had reservations about investing in Berkeley's film, "Swept Away", after airing his concerns with the Markses in Cambridge. Second, despite his repeated demands for more promotion of "Swept Away", Lea Marks did nothing to improve the distribution of the film. Petitioner and Abramson eventually paid their own money to advertise the film in Miami. Despite petitioner's own personal motivation in Berkeley, the general partner had no profit motivation in this investment and therefore it lacked economic substance. In addition, the unlikelihood of achieving a profitable operation is an important factor bearing on the taxpayer's true intention. Sec. 1.183-2(b)(6), Income Tax Regs. In the case at hand, no evidence was introduced *40 regarding the possibility that this film's gross receipts would exceed the $ 9.4 million needed to cover the principal portion of the nonrecourse debt. Accordingly, we conclude that Lea Marks did not possess the requisite profit motive necessary to give economic substance to this partnership. Petitioners' claimed losses and credits are properly disallowed. Consents to Extend Statute of Limitations
Petitioners challenge the validity of their consents to extend the statute of limitations for the years in issue, on the ground that the consents were improperly solicited and thus void ab initio. Petitioners contend that respondent represented that the waivers (Forms 872-A) were necessary in order to fully consider and meaningfully negotiate the tax questions presented by petitioners, when in reality respondent had no intention of providing them with a meaningful opportunity to negotiate their proposed taxes. Petitioners further assert that they reasonably relied upon respondent's representations and, in accordance, executed the waivers. Petitioners thus argue that no mutual assent was present and thus no valid agreements were executed. [7] We disagree. *41 A consent to extend the period for assessment of an income tax is essentially a unilateral waiver of a defense by the taxpayer and is not a contract. Stange v. United States, 282 U.S. 270 (1931); Piarulle v. Commissioner, 80 T.C. 1035, 1042 (1983) (citing Tallal v. Commissioner, 77 T.C. 1291 (1981)). Contract principles are significant, however, because section 6501(c)(4) requires that the parties reach a written agreement as to the extension. "Agreement" means a manifestation of mutual assent. Piarulle v. Commissioner, supra (citing S. Williston, Contracts 6 (3d ed. 1957)). Petitioners argue that respondent's conduct amounts to constructive fraud and makes any consent to extend the period for assessment ineffective. We disagree. Petitioners have not cited nor have we found any instance in which respondent's actions are tantamount to misconduct or bad faith. Respondent did, in fact, propose a settlement which petitioners refused. As we stated in Feldman I, petitioners had ample opportunity to terminate their consent if they felt it was achieved *42 by fraud or delay tactics on the part of respondent. Petitioners rely on the Seventh Circuit's decision in Borg-Warner Corp. v. Commissioner, 660 F.2d 324 (7th Cir. 1981) to assert that the executed waivers were ineffective because no settlement negotiations were possible at the date of execution and thus no mutual assent was present. Petitioners base their argument on the following excerpt from the opinion: The purpose of agreements extending the statutory limitations period is to allow a taxpayer to seek compromises of its asserted tax liability. See United States v. Herman, 186 F. Supp. 98 (E.D. N.Y. 1960). When the possibilities of settlements have been exhausted, the quid pro quo for the extension of this limitations period disappears.
Id. at 328. In Borg-Warner, the taxpayer executed a Form 872-A on July 18, 1974. The agreement, executed by the taxpayer, specifically provided that it could be terminated on "mailing by the Internal Revenue Service of written notification to the taxpayer(s) of termination of Appellate Division consideration". Id. at 325. After discussions with the taxpayer's *43 representatives, one of the Appellate Division conferees wrote to inform the taxpayer's representatives that no mutually satisfactory basis for closing the case had been reached and that they intended to recommend issuance of a notice of deficiency. Id. at 326. The Court determined that the letter from the Appellate Division constituted notification of termination. The Court did not hold that termination of Appellate Division consideration per se vitiated the consent. Id. at 332. Petitioners reliance on Borg-Warner is misplaced. Unlike the situation in Borg-Warner, the manner in which termination is to occur is unambiguously set out in Form 872-A and in Rev. Proc. 79-22, 1979-1 C.B. 563, which provides: Sec. 4.02 With the exception of the mailing of a notice of deficiency, written notification by the Service to the taxpayers of termination of Service consideration can only be made using Form 872-T.
Therefore, since petitioners' situation does not fall within the above parameters, their consent did not terminate until the mailing of the notice of deficiency. Respondent noted that petitioners' arguments are *44 similar to those raised in Klein v. Commissioner, T.C. Memo. 1986-521. We agree. In Klein, the taxpayers argued that the extensions they executed through Forms 872 and 872-A were invalid because of: (1) Misrepresentation by respondent; (2) respondent's misconduct; and (3) respondent's failure to contemplate settlement negotiations when securing the consents. The taxpayers' arguments were rejected. Id. Like the taxpayers in Klein, petitioners have failed to introduce any credible evidence of misrepresentation, misconduct, or lack of contemplation to settle on the part of respondent. To the contrary, petitioner has introduced letters and his own testimony confirming offers of settlements by respondent, which he rejected as "not equitable." We therefore find petitioners bound by their consents to extend the period for assessment of taxes. As a consequence, the statute of limitations is open for the periods in issue. Additional Interest under Section 6621(c)
Respondent contends that petitioners are liable for the increased interest rate provided in section 6621(c)[8] for taxable years 1974, 1975, 1976, 1977, 1978, and 1980. The *45 increased interest rate is 120 percent of the normal statutory rate provided by section 6601. [9]
In Feldman I we held that the application of section 6621(c) is not unconstitutional, nor is it being retroactively applied where, as here, the statute of limitations has not expired. "Substantial underpayment" is an underpayment of taxes in excess of $ 1,000. Sec. 6621(c)(2). Activities not engaged in for *46 profit under section 183 are considered to be tax motivated transactions. Sec. 301.6621-2T (Q-4) and (A-4), Temp. Proced. and Admin. Regs., 49 Fed. Reg. 50391, 50392 (Dec. 28, 1984). As previously discussed in the context of distributive losses and credits, the motivation of the general partner controls whether a limited partnership has economic substance. Fox v. Commissioner, 80 T.C. 972, 1008 (1983). Even if we were to take into account petitioners' intentions and motivations in making the investment, we would still find the transactions to be tax motivated for purposes of section 6621(c). In the case at hand, petitioners have failed to substantiate the legitimacy of their investment in Essex. They have offered no evidence regarding the existence or profit motive of the general partner, or the formation and operation of the alleged business. Nor has petitioner offered any evidence of his own motive or intentions regarding the Essex investment. Therefore, we find that the understatements related to this investment will be subject to additional interest under section 6621(c) as attributable to a tax motivated transaction. *47 Petitioners' investment in Cambridge and Berkeley is more problematic. In both investments, petitioner wrote numerous letters to the general partner, Lea Marks, requesting assurances that she was adequately protecting his interests as a limited partner, as well as expressing concerns over lack of proper promotion and advertisement. Petitioner closely monitored the progress of the films in which his partnerships had acquired rights. In the case of the film "Swept Away," petitioner actually solicited and purchased radio advertisements to promote the film while it was showing in Miami. Petitioner had numerous meetings with the general partners over the lack of promotion, even threatening legal action. Petitioner relied on the expertise of the general partner, Lea Marks, who had experience and success in the film industry. On the other hand, we are not persuaded that petitioner or the general partners had a bona fide objective of actually realizing a profit, as evidenced by the enormous losses claimed and disallowed in comparison to the amounts invested. In connection with Essex, for the years 1974 through 1977 petitioners deducted losses in the amounts of $ 64,587, $ 9,725, $ *48 11,018 and $ 803. Cambridge losses claimed were $ 27,459 and $ 43,850 for 1974 and 1975, followed by smaller amounts in later years. Berkeley losses were $ 135,331 in 1975, $ 50,195 in 1976, and $ 10,528 in 1977, with smaller amounts through 1980. Petitioner did not establish -- nor do we believe he could have established -- that, even with excellent promotion, it would have been possible to have paid off the nonrecourse notes and walked away with a profit, apart from the tax benefits. In conclusion, we find that petitioners' investments in Cambridge and Berkeley, as well as their investment in Essex, constitute tax motivated transactions and are, therefore, subject to the increased interest rate under section 6621(c). Addition to Tax-Section 6651(a)(1)
Respondent determined that petitioners are liable for the addition to tax for failure to file their 1975 Federal tax return on or before the filing due date. Section 6072(a) provides that individual income tax returns shall be filed on or before the 15th day of April following the close of the calendar year. The Secretary of the Treasury may grant a reasonable extension for filing a return, up to a maximum of 6 months. *49 Sec. 6081(a). Section 6651(a)(1) provides for an addition to tax for failure to file a return timely. However, the addition is not applicable if "it is shown that such failure is due to reasonable cause and not to willful neglect". Petitioners have the burden of proving such failure was due to reasonable cause. Rule 142(a); Electric & Neon, Inc. v. Commissioner, 56 T.C. 1324, 1342 (1971), affd. without published opinion sub nom. Jiminex v. Commissioner, 496 F.2d 876 (5th Cir. 1974). [10] The amount of the penalty is five percent for each month or fraction of a month for which the return is delinquent, not to exceed 25 percent in the aggregate. Sec. 6651(a)(1). *50 Petitioners filed their 1975 Federal income tax return on August 20, 1976. Attached to that return was an Application for Automatic Extension of Time to File U.S. Individual Income Tax Return which granted petitioners until June 15, 1976, to file their return or seek an additional extension of time. Petitioners sought, but were denied, an additional extension because the application for extension was not received by respondent until after the expiration date of June 15, 1976. Petitioners have failed to affirmatively prove that their failure to timely file was due to reasonable cause and not willful neglect. They did not present any evidence or offer any testimony that supported a reasonable cause for failing to file. On their first application for extension of time to file, petitioners did list as their reason that material information had not been received from unrelated third parties who were not within their control. Standing alone, this is insufficient to excuse petitioners' failure to file their return by the extended due date of June 15, 1976, or to timely request an extension of that date. Stark v. Commissioner, T.C. Memo. 1982-639. Moreover, *51 a taxpayer's reliance on an agent, attorney or accountant, to timely file a return is not reasonable cause. See United States v. Boyle, 469 U.S. 241 (1985). Petitioners are thus liable for additions to tax under section 6651(a) for failure to timely file their 1975 Federal income tax return. Innocent Spouse Relief
Petitioners contend that Mrs. Feldman qualifies for innocent spouse relief. Respondent argues to the contrary. The liability for tax due is joint and several when a husband and wife file a joint Federal income tax return. Sec. 6013(d)(3). But relief may be granted to an innocent spouse under the provisions of section 6013(e). Section 6013(e)(1) provides that where: (A) a joint return has been made under this section for a taxable year, (B) on such return there is a substantial understatement of tax attributable to grossly erroneous items of one spouse, (C) the other spouse establishes that in signing the return he or she did not know, and had no reason to know, that there was such substantial understatement, and (D) taking into account all the facts and circumstances, it is inequitable to hold the other spouse liable *52 for the deficiency in tax for such taxable year attributable to such substantial understatement,
then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent that such liability is attributable to such substantial understatement.
In order for relief to be afforded, all four statutory requirements must be met. Estate of Jackson v. Commissioner, 72 T.C. 356, 360 (1979). Mrs. Feldman bears the burden of proving that she satisfies each element of the requirements of section 6013(e)(1). Welch v. Helvering, 290 U.S. 111 (1933); Bokum v. Commissioner, 94 T.C. 126, 138 (1990). The first requirement that a joint return be filed for the taxable years in issue has been satisfied. Section 6013(e)(1)(B) requires that there be a substantial understatement of tax attributable to grossly erroneous items of one spouse. We first address the requirement "attributable to * * * items of one spouse." We note that the Schedule K-1's issued by Berkeley for years 1977 and 1979 list the partners' names as "Donald & *53 Patsy Jane Feldman". Therefore, Mrs. Feldman is unable to obtain innocent spouse relief as to this investment because it is attributable to her as well as her husband. However, the investment in Cambridge was made by petitioner with Abramson, and the investment in Essex was made by petitioner alone. Therefore, a determination as to those investments must be made. We next address the requirement of "grossly erroneous items." Under section 6013(e)(2), grossly erroneous items are defined as omitted items of gross income (not here applicable) and "any claim of a deduction, credit or basis by such spouse in an amount for which there is no basis in fact or law". This Court has held as follows: A deduction has no basis in fact when the expense for which the deduction is claimed was never, in fact, made. A deduction has no basis in law when the expense, even if made, does not qualify as a deductible expense under well-settled legal principles or when no substantial legal argument can be made to support its deductibility. Ordinarily, a deduction having no basis in fact or in law can be described as frivolous, fraudulent, or, to use the word of the committee report, phony. *54 Douglas v. Commissioner, 86 T.C. 758, 762-763 (1986); Flynn v. Commissioner, 93 T.C. 355, 364 (1989). However, it does not follow that all deductions which are disallowed are frivolous, fraudulent, or phony. Although we have disallowed the losses claimed based upon petitioners' inability to prove a bona fide profit objective, we cannot say they have no basis in fact or in law. Petitioners produced scant evidence concerning the actual activities and motives of the partnerships and the general partners. It does not follow that the deductions are grossly erroneous merely because petitioners failed to substantiate them on this record. Accordingly, we find that petitioner Patricia Feldman has failed to prove that the deductions are grossly erroneous items within the meaning of section 6013(e)(2)(B). She is therefore not relieved of liability with respect to the claimed deductions. We acknowledge and sympathize with petitioners' current medical and financial difficulties. Subsequent to the years in issue, Mrs. Feldman underwent a kidney transplant, incurring large medical expenses and expensive medical insurance coverage. *55 This has put additional strain on petitioners' already tenuous financial condition. However, we are constrained by the boundaries of the law. In accordance, we find that Mrs. Feldman is not eligible for innocent spouse relief for the years in issue. In conclusion, we disallow the distributive losses and credits attributable to petitioners' three investments in Essex, Cambridge, and Berkeley. We find that petitioners are bound by their consents to extend the period for assessment of tax for each of the years in issue. We also find that petitioners are liable for additions to tax for failure to timely file their 1975 Federal tax return. Petitioners are liable for increased interest under section 6621(c). Finally, Mrs. Feldman is not entitled to innocent spouse relief. To reflect the foregoing, Decision will be entered for respondent. Footnotes
1. After trial, Messrs. Kaplan and Weill withdrew; thus petitioners were pro se when they filed their briefs.↩
1. 120 percent of the interest due on the deficiency for the taxable year.↩
2. All section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.↩
3. Form 872-A provides that the Federal income tax due for the year may be assessed on or before the 90th day after: (a) the Internal Revenue Service office considering the case receives Form 872-T, Notice of Termination of Special Consent to Extend the Time to Assess Tax, from the taxpayer(s); or (b) the Internal Revenue Service mails 872-T to the taxpayer(s); or (c) the Internal Revenue Service mails a notice of deficiency for such periods. * * *↩
1. Due date of tax return extended to 10/15 of year following the tax year.↩
4. See Abramson v. Commissioner, T.C. Memo. 1987-276. In a previous opinion related to this case, we denied respondent's motion for summary judgment based on Abramson, holding that collateral estoppel did not apply. Feldman v. Commissioner, T.C. Memo. 1990-532↩ ("Feldman I").
5. Ancillary market revenues include airlines, mining camps, armed forces' bases, etc.↩
6. Sec. 183 provides in pertinent part: (a) General Rule. -- In the case of an activity engaged in by an individual or an electing small business corporation (as defined in section 1371(b)), if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section. (b) Deductions Allowable. -- In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed -- (1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and (2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1).
(c) Activity Not Engaged in for Profit Defined. -- For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212↩.
7. In Feldman I, we addressed the validity of the extensions executed by petitioners and held that the Form 872-A may only be terminated through the issuance of a Form 872-T or a notice of deficiency. We will not repeat our reasoning here. We held open the question of whether the consent was induced by fraud.↩
8. Subsection (d) of sec. 6621↩ was redesignated subsection (c) and amended by the Tax Reform Act of 1986, Pub. L. 99-514, sec. 1511(c)(1)(A)-(C), 100 Stat. 2744. We use the reference to the Internal Revenue Code as redesignated and amended.
9. The 120 percent rate applies only to taxes imposed by subtitle A (income taxes) and to interest accrued with respect to such taxes. Penalties, additional amounts, and additions to tax are not included in the amount of a tax-motivated underpayment. Sec. 301.6621-2T (A-12), Temporary Income Tax Regs., 49 Fed Reg. 50391, 50392↩ (Dec. 28, 1984).
10. In Bonner v. City of Prichard, 661 F.2d 1206↩ (11th Cir. 1981) (en banc), the United States Court of Appeals for the Eleventh Circuit (to which an appeal in this case would lie) adopted as precedent all decisions of the former United States Court of Appeals for the Fifth Circuit prior to Oct. 1, 1981.